**UNITED STATES of America**

v.

**Michael Roy VALLIERES and Gregory McGann.**

**Crim. No. H-77-51.**

United States District Court, D. Connecticut.

Dec. 2, 1977.

M. Hatcher Norris, Asst. U. S. Atty., Richard Blumenthal, U. S. Atty., Hartford, Conn., for plaintiff.

James Michael Merberg, Law Offices of F. Lee Bailey, Boston, Mass., Richard R. Brown, Hartford, Conn., for defendants.

## RULING ON DEFENDANTS' MOTION TO SUPPRESS

CLARIE, Chief Judge.

The defendants Michael Roy Vallieres and Gregory McGann have been charged in a two-count indictment with possession of cocaine with attempt to sell the same, and conspiracy to sell the same, in violation of 21 U.S.C. § 841(a)(1). They have moved, pursuant to Rule 41(e), Fed.R.Crim.P., to suppress for use in evidence at their trial or trials any and all statements, admissions, and/or confessions alleged to have been made by them to government agents or other persons related to the offenses charged in the indictment and to suppress the fruits of the search that followed. The basis of their motions is grounded in the claims (1) that they were not given timely *Miranda* warnings; (2) they were arrested without probable cause; (3) the property seizure was not carried out incident to a lawful arrest; and (4) such other reasons educed at the oral hearing. With respect to evidence relating to an oral statement made by Vallieres to Agents Warren and Meyrick on June 13, 1977, at the Drug Enforcement Administration offices in Hartford and to those physical items seized from two closed pieces of luggage, the motion is granted and the evidence is ordered suppressed. With respect to all other evidence—specifically physical evidence found in the car or in the unzippered suitcase—the motion to suppress is denied.

### Facts

In November 1976, a drug enforcement agent acting in an undercover role met the defendant Vallieres, who advised him that he and his associates in Miami, Florida had in their control for sale approximately 15,000 pounds of marijuana and 20 kilograms of cocaine. On June 10, 1977, Vallieres telephoned the agent and represented that he had come up from Miami with a sample pound of the cocaine to show to him and other customers and he intended to sell it off in one ounce quantities. The following day by prearrangement the agent met both defendants at the Sheraton Hotel in Hartford, at which time the defendant McGann stated that the only reason he came up to Hartford from Miami was to show the agent the cocaine.

Vallieres explained that the cocaine was a representative sample of 40 to 45 kilograms of the drug, that they had available in Miami at the time. McGann stated that the price would be approximately $38,000 to $40,000 per kilogram of cocaine.

It was agreed that the agent would meet them that afternoon at about 3:00 p. m. in the parking lot of Valle's Steak House. The defendants arrived at the proposed meeting place shortly after three o'clock, driving a white 1977 AMC Hornet car. After they arrived, both exited the vehicle. Vallieres proceeded to open the trunk of the vehicle and McGann was observed taking a white object from the trunk and transferring it to the vehicle's interior, at which time they both reentered the car. The vehicle was then driven to the south side of the restaurant.

The agent then approached the vehicle and McGann got into the rear seat. The agent got into the front passenger seat with Vallieres. McGann then told Vallieres to unlock the glove compartment but not to open it up, which he did. When Vallieres suggested going to a quiet place to permit the agent to inspect the cocaine, the agent suggested a nearby McDonald's Restaurant as appropriate. Vallieres drove the vehicle there and upon arrival he exited the vehicle and went into the restaurant, leaving McGann and the agent together alone. McGann then told the agent to open the

glove compartment to inspect the cocaine. As he did so McGann suggested that he could try some, and that that was the reason for their being there.

The agent proceeded to remove a package wrapped in a white towel from the glove compartment, inspected a number of plastic bags containing a white powder, which he was told was the cocaine, and then placed it back in the glove compartment. He told the agent that Vallieres had set up an appointment schedule of all those people he had planned to meet for the purpose of selling cocaine. Vallieres then returned to the car and asked the agent whether or not he was pleased with what he had been shown; the agent replied in the affirmative.

Vallieres then drove the car back to Valle's Steak House, where they all got out; and at a prearranged signal from Agent Warren, his colleague agents moved in and proceeded to arrest both McGann and Vallieres. Agent Warren then proceeded to open the glove compartment and remove the sample bundle of cocaine that he had just previously been told by McGann to handle and inspect. A field test was conducted, which indicated a positive reaction to the presence of cocaine.

Both defendants were arrested and immediately advised of their "*Miranda* rights." Agent Sloboda was handed the keys to the vehicle operated by Vallieres, by a person whose identity he could not recall. He used the keys to open the trunk of the vehicle, from which he had previously observed McGann remove the bundle found in the glove compartment. He saw before him three pieces of luggage, one of which was unzipped. In this open suitcase he observed a plastic bag containing a substance which appeared to him, as an experienced agent, to be marijuana. He closed the trunk and drove the car to the garage in the basement of the Federal Building at 450 Main Street, Hartford, Connecticut. While this garage area is usually kept locked and is subject to security surveillance, often times the overhead automatic door is open. Access to the area by the public is possible and security supervision is only nominal.

An inventory of the vehicle's contents was performed after it was driven to this garage. On the floor of the interior of the vehicle, Agent Meyrick found a Ramada Inn hotel receipt in the name of E. Phillips and a rental lease agreement for the use of the vehicle. The agents removed the three pieces of luggage from the car and inventoried them in the presence of the defendants. The open suitcase contained 468.5 grams of a substance believed to be marijuana, and an address and telephone book. Round trip airline tickets to Florida were discovered in one of the closed pieces of luggage. Inside the address book three slips of paper believed to be a schedule of Vallieres' prospective meetings with potential drug purchasers were found. Furthermore, in a search incident to the arrest, agents seized $3,208 from the person of defendant McGann and $450 from the person of Vallieres.

On June 11, 1977, an agent interviewed McGann while he was in custody at the Hartford Drug Enforcement Administration office, after advising him of his constitutional rights. After the agent told him that any cooperation would be brought to the attention of the prosecutor, McGann stated that he would like to cooperate, but that he could not because all the contacts in the Connecticut area were Vallieres' and he only knew them by their first names. The agent asked McGann about the identity of the person he met in the Tom Sawyer Lounge at the Sheraton Hotel and he responded that he only knew his name was Peter.

When Vallieres was questioned, he declined to make any statements to the agents about the case without first speaking to his attorney. The arrests occurred on Saturday afternoon and since a magistrate was not available for arraignment, the defendants were detained at the Hartford lockup over the weekend.

On Monday morning, June 13, 1977, between 8:30 and 9:30 a. m., both defendants were transported to the offices of the Drug Enforcement Administration for processing.

Agent Warren again advised Vallieres of his constitutional rights and inquired of him whether or not he had changed his mind about cooperating. Vallieres said, "I have nothing to tell you." Agent Meyrick then persisted, "Well, there is one thing that I want to clear up with you at this time, and you don't have to answer this question if you don't want to. But, who was the individual that you met with in the Tom Sawyer Lounge, after you left Agent Warren?" Vallieres responded that he had met with Peter Mozelski. The agent further inquired if he had distributed cocaine to Peter Mozelski during that meeting. Vallieres responded that he had not, that they had met strictly for negotiating a sale. At the time this questioning was taking place, the defendants' attorney, who had visited them the day before, was waiting in the outside office and Agent Meyrick had been advised by Agent Tuttle that he was waiting there to see them. The defendant McGann made no statements on June 13, 1977.

### Discussion of The Law

■ The facts of this case are overwhelmingly persuasive that probable cause existed, which justified the arrest of both defendants without a warrant. The government agent, at McGann's direction, had opened the glove compartment only moments before the arrest in order to inspect the contraband drug, which was represented by both defendants to be a sample of the cocaine they had for sale. The agent had personally seen the drug, handled it, and was invited by McGann to try it. Vallieres expressed his continued active participation in the criminal negotiations by his inquiry of the agent, whether or not he was pleased with the cocaine which had been shown to him. Vallieres' conversation indicated that he had full knowledge of the existence of the drug in the car, and the purpose of the meeting, and it also demonstrated his participation in the furtherance of the joint project. Probable cause to arrest both defendants clearly existed and the arrests were legally justified.

■ The search of the car without a warrant is justified under two independent exceptions to the warrant requirement. First is the search incident to lawful arrest.

"The prevailing rule under the Fourth Amendment that searches and seizures may not be made without a warrant is subject to various exceptions. One of them permits warrantless searches incident to custodial arrests, *United States v. Robinson,* 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973); *Chimel v. California,* 395 U.S. 752, 755, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969); *Weeks v. United States,* 232 U.S. 383, 392, 34 S.Ct. 341, 58 L.Ed. 652 (1914), and has traditionally been justified by the reasonableness of searching for weapons, instruments of escape, and evidence of crime when a person is taken into official custody and lawfully detained.

"It is also plain that searches and seizures that could be made on the spot at the time of arrest may legally be conducted later when the accused arrives at the place of detention. If need be, *Abel v. United States,* 362 U.S. 217, 80 S.Ct. 683, 4 L.Ed.2d 668 (1960), settled this question. There the defendant was arrested at his hotel, but the belongings taken with him to the place of detention were searched there. In sustaining the search, the Court noted that a valid search of the property could have been made at the place of arrest and perceived little difference.

.   .   .   . .   .

"The courts of appeal have followed this same rule, holding that both the person and the property in his immediate possession may be searched at the station house after the arrest has occurred at another place and if evidence of crime is discovered, it may be seized and admitted in evidence." *United States v. Edwards,* 415 U.S. 800, 802–803, 94 S.Ct. 1234, 1236, 39 L.Ed.2d 771 (1974).

The principle of whether the search is reasonable under all of the existent circumstances has been generally followed by the Second Circuit, as expressed in *United*

*States v. Tramunti,* 513 F.2d 1087, 1104 (2d Cir. 1975), where the Court said:

"While the Government would justify the search under *United States v. Edwards,* 415 U.S. 800, 94 S.Ct. 1234, 39 L.Ed.2d 771 (1974), on the broad basis that arresting officers may properly take, examine and preserve for use 'the personal effects of the accused,' we need not go so far. Here the suitcase was 'closely related to' the reason appellant was arrested and the reason the auto was stopped, *see Cooper v. California,* 386 U.S. 58, 62, 87 S.Ct. 788, 17 L.Ed.2d 730 (1967), *and* there was probable cause to believe, as these officers did, that the suitcase contained contraband. The Supreme Court has made it clear, moreover, that a different set of rules prevails as to searches of automobiles (as opposed to homes or offices) 'provided that there is probable cause to believe that the car contains articles that the officers are entitled to seize.' *Chambers v. Maroney,* 399 U.S. 42, 48, 90 S.Ct. 1975, 1979, 26 L.Ed.2d 419 (1970) . . . .. Here there was, as we have said, probable cause to think that the suitcase in the auto contained narcotics."

*See also, United States v. Capra,* 501 F.2d 267 (2d Cir. 1974), *cert. den.,* 420 U.S. 990, 95 S.Ct. 1424, 43 L.Ed.2d 670 (1975). The search in the present case was clearly carried out incident to the lawful arrest.

■ As a second, independent justification, it should be noted that 21 U.S.C. § 881 specifically provides for the seizure and forfeiture of vehicles used as conveyances of controlled drugs. It states in relevant part:

"Any property subject to forfeiture to the United States under this title may be seized by the Attorney General upon process issued pursuant to the Supplemental Rules for Certain Admiralty and Maritime Claims by any district court of the United States having jurisdiction over the property, *except that seizure without such process may be made when—*

"(1) the seizure is incident to an arrest . . . .." (Emphasis added).

The warrantless seizure of the defendant's leased car, in this instance, was incident to a lawful arrest. When the keys of the car were taken by the agent, the sole custody of the vehicle was then in the possession and control of the Government. Thus the agents' continued inventory of the contents of the car was routine and permissible. Here the seizure of the vehicle followed as a natural consequence of the agent's knowledge of the presence of cocaine. *See also, United States v. One 1974 Cadillac Eldorado Sedan, Serial 6L47S4Q407966,* 548 F.2d 421 (2d Cir. 1977).

At the moment the keys were transferred to the agent the defendants had forfeited any possessory rights in the vehicle, and therefore the defendants lack standing to object to either the opening of the trunk at Valle's Steak House or the inventory of the vehicle itself conducted at the Federal Building.

"Moreover, if the seizure be lawful, as it concededly was here, and the officers have obtained exclusive possession of the vehicle, forfeited to the United States because of its use in violation of the revenue laws, and of its contraband contents, the former possessor has no remaining rights for which the Fourth Amendment lends protection. There appears no good reason why officers may not inventory the contents of an automobile when they are lawfully in possession of the vehicle and of its contents without having to obtain a warrant to search what they already lawfully possess." *United States v. Haith,* 297 F.2d 65, 68 (4th Cir. 1961) *cert. den.* 369 U.S. 804, 82 S.Ct. 643, 7 L.Ed.2d 550 (1962).

*See also, United States v. Francolio,* 367 F.2d 1013, 1021 (2d Cir. 1966), *cert. den.,* 386 U.S. 960, 87 S.Ct. 1020, 18 L.Ed.2d 110 (1967); *O'Reilly v. United States,* 486 F.2d 208, 210 (8th Cir. 1973), *cert. den.,* 414 U.S. 1043, 94 S.Ct. 546, 38 L.Ed.2d 334 (1974).

This principle of forfeiture is not a new development in the law.

"By the settled doctrine of this court, whenever a statute enacts that upon the

commission of a certain act specific property used in or connected with that act shall be forfeited, the forfeiture takes effect immediately upon the commission of the act; the right to the property then vests in the United States, although their title is not perfected until judicial condemnation; the forfeiture constitutes a statutory transfer of the right to the United States at the time the offence is committed; and the condemnation, when obtained, relates back to that time, and avoids all intermediate sales and alienations, even to purchasers in good faith." *United States v. Stowell*, 133 U.S. 1, 16–17, 10 S.Ct. 244, 247, 33 L.Ed. 555 (1890).

The important distinction between the instant case and *United States v. Chadwick*, 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977) is that in that latter case there was no ground for arresting the defendants independent from the evidence seized in the warrantless search. In the case *sub judice* the agent's viewing and handling of the drugs gave him cause to arrest the defendants. The valid arrest provided the basis for a search incident to the arrest. Moreover, the agent's viewing of the contraband justified the forfeiture and search of the vehicle.

█ Since the agents were justified in opening the trunk, they needed no warrant to seize the marijuana and address book contained in the unzippered bag because those items were in plain view in a place where the agents had a lawful right to be. *Coolidge v. New Hampshire*, 403 U.S. 443, 465, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971).

However, as to the remaining two closed pieces of luggage, which were removed from the car at the garage in the Federal Building, it would appear that the recent case of *United States v. Chadwick, supra*, would prevent the inventory of the contents of these two bags without a search warrant.

"Once law enforcement officers have reduced luggage or other personal property not immediately associated with the person of the arrestee to their exclusive control, and there is no longer any danger that the arrestee might gain access to the property to seize a weapon or destroy evidence, a search of that property is no longer an incident of the arrest.

"Here the search was conducted more than an hour after federal agents had gained exclusive control of the footlocker and long after respondents were securely in custody; the search therefore cannot be viewed as incidental to the arrest or as justified by any other exigency. Even though on this record the issuance of a warrant by a judicial officer was reasonably predictable, a line must be drawn. In our view, when no exigency is shown to support the need for an immediate search, the Warrant Clause places the line at the point where the property to be searched comes under the exclusive dominion of police authority. Respondents were therefore entitled to the protection of the Warrant Clause with the evaluation of a neutral magistrate, before their privacy interests in the contents of the footlocker were invaded." *Id.* 433 U.S. at 15, 97 S.Ct. at 2485. (Footnotes omitted).

Therefore, while the agents were entitled to inventory the vehicle and seize any items in plain view, they were not entitled to search the closed pieces of luggage contained in the vehicle. Accordingly, the Court will suppress the contents of those two pieces of luggage.

█ With respect to the questioning of Vallieres on June 13, 1977 at the office of the Drug Enforcement Administration, the case of *Miranda v. Arizona*, 384 U.S. 436, 473–474, 86 S.Ct. 1602, 1627, 16 L.Ed.2d 694 (1966) establishes the applicable rule.

"Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. Without the right to cut off questioning,

the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked." (Footnote omitted).

*Also see, Michigan v. Mosley,* 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975).

Counsel waiting to consult with his clients should have been permitted to advise them, before the agent persisted in his questioning.

". . . [T]he clear rule of *Massiah* is that once adversary proceedings have commenced against an individual, he has a right to legal representation when the government interrogates him. It thus requires no wooden or technical application of the *Massiah* doctrine to conclude that Williams was entitled to the assistance of counsel guaranteed to him by the Sixth and Fourteenth Amendments." *Brewer v. Williams,* 430 U.S. 387, 401, 97 S.Ct. 1232, 1240, 51 L.Ed.2d 424 (1977) (Footnote omitted).

*Also see, Massiah v. United States,* 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964).

The agent's action constituted a deliberate attempt to deprive the defendant of counseling by his attorney. The Court finds that Vallieres was deprived of his constitutional right to the assistance of counsel as to this particular statement only. Accordingly, Vallieres' identification of Mozelski and his admission that he was in fact negotiating for a deal in cocaine is ordered suppressed. The Court also grants the defendants' motion to suppress all physical evidence taken from the two closed pieces of luggage removed from the trunk of the vehicle at the government garage. In all other respects, the motion to suppress is denied.

SO ORDERED.