**UNITED STATES of America,**

v.

**James McGRATH, John Schaller, Bruce Buckle and Joan de la Cova, Defendants.**

No. M-11-188.

United States District Court, S. D. New York.

April 25, 1978.

Robert B. Fiske, Jr., U. S. Atty., S. D. N. Y., New York City, for United States; William J. Kelleher, Asst. U. S. Atty., New York City, of counsel.

Michael Kennedy, New York City, for James McGrath.

Gerald B. Lefcourt, New York City, for Bruce Buckle.

Howard L. Jacobs, New York City, for John Schaller; Rachel H. Wolkenstein, New York City, of counsel.

LASKER, District Judge.

Defendants McGrath, Schaller, Buckle and de la Cova move, prior to indictment, under Rule 41(e) of the Federal Rules of Criminal Procedure to suppress evidence which they claim was seized from them illegally. For the following reasons, the motion is denied.

On January 30, 1978, agents of the Drug Enforcement Agency (DEA) arrested a man who was found to possess approximately 20 pounds of marijuana. The man agreed to cooperate with the agents and informed them that he could lead them to a huge cache of marijuana. He advised the agents that a certain Jack Schaller was about to transport 1100 pounds of marijuana from Hurley, New York, into New York. City. He provided the agents with a detailed description of the vehicle Schaller would be driving, including its year, make and registration number, and of the route which he would follow.

On the afternoon of January 31, at 2:00 P.M., the agents, who together with the New York State police, had stationed themselves on the New York Thruway, observed a pickup truck which fit the description supplied by the informant. They began to follow it along the route described to them, at one point stopping at a Volkswagen dealership where the truck was joined by a Volkswagen automobile. Having checked the registration numbers, the agents discovered that the automobile was registered to John H. Schaller and the pickup truck to James McGrath.

The police continued to follow both vehicles until they disappeared up a private road, and came to the dead end at which his residence was located. The time was 5:00 P.M. At this point, the two vehicles continued under observation by police hovering above the area in aircraft, while the ground policemen and DEA agents stationed themselves at the foot of the private driveway to await departure of the pickup truck, which they expected to be loaded with marijuana, for New York City.

At about 9:00 P.M., the truck left the Schaller residence and was stopped by the assembled police as soon as it reached the public road. According to John Schaller, the agents then forced him and the driver out of the truck at gunpoint and searched them on the road. (Schaller Affidavit, ¶ 4) The police then broke into the locked camp-

er loaded onto the back of the pickup truck where they discovered almost 700 pounds of marijuana. The police also seized Schaller's attache case, which was placed under the passenger seat in the front of the truck, in which they discovered various books and records.

Following the search of the truck, the officers secured a warrant from a local magistrate which authorized them to search Schaller's property, including his house, barn and any vehicles on the land. As a basis for the search warrant, the police offered affidavits which were largely prepared while waiting for the truck to leave Schaller's property.[1] The search of Schaller's property uncovered approximately 3300 pounds of marijuana, along with notebooks, ledgers and other records of a drug operation, currency and illegally possessed guns.*

The defendants now move to suppress this evidence, prior to the issuance of any indictment against them, and to have the property returned. They argue that the search of the pickup truck was unconstitutional since the police had adequate opportunity to obtain a warrant from the time they first spotted the pickup truck and 2:00 P.M. until the time of the search at 9:00 P.M.[2] Since the warrant to search the house was obtained on the basis of the evidence found in the truck, they assert that all items seized from Schaller's property must also be suppressed as the fruit of the prior illegal search. The government responds that, because probable cause existed to believe that the truck contained marijuana, the search was justified under the "automobile exception" to the Fourth Amendment's warrant requirement, and

the ensuing search of the property was therefore valid.[3]

### I. Search of the Camper

 The defendants place their primary reliance on *Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). While recognizing the special rules regulating searches of automobiles, they argue that here, as in *Coolidge*, the police knew so far in advance that evidence was contained in the truck that they cannot now claim that exigent circumstances prevented them from obtaining a warrant.

The facts in *Coolidge* are, however, significantly different from those involved here. In *Coolidge*, the police had suspected for a matter of weeks that Coolidge's car might contain evidence of a crime. Moreover, at any time during this extended period after the crime was committed and before his arrest, Coolidge could have tampered with the evidence. Nevertheless, immediately after the arrest, the automobile was seized from Coolidge's driveway and thoroughly searched, without a warrant, at the police station. This procedure was followed even though Coolidge had been taken away, his wife, the only other person with access to the car, had been sent to stay with relatives, and an around-the-clock police guard was set up around Coolidge's house. Under these circumstances, the Supreme Court held that no exigent circumstances, such as fear of flight or the presence of contraband, would justify a warrantless search of the vehicle.

While it is true that the police in this case were aware for an extended period of time of the possible presence of contraband in

---

**1.** The affidavits describe the arrest of the informant, the information received by the DEA agents from him, and the "tail" of the pickup truck. After the truck was searched, the agents filled in the details as to what they found in the truck and presented the affidavits to the magistrate. (See, in particular, the affidavit of C. S. van Wagenen)

\* These facts are undisputed.

**2.** In particular, the defendants argue that the fact that the police drew up their affidavits in

support of the warrant to search the residence while waiting for the truck to leave establishes that the warrantless search of the truck was planned.

**3.** The government asserts that the search was valid on several other grounds as well, including the Contraband Seizure Act, 49 U.S.C. §§ 781–89. We limit ourselves here to considering what appears to be the strongest legal basis for the search.

the truck, what happened here does not amount to a "planned warrantless search", within the meaning of *Coolidge*. Unlike the police in *Coolidge*, the officers here were not confronted with a stationary automobile but one which was actually being used (and which they had good reason to believe was being used) to transport contraband.[4] At most, they had from 2:00 P.M., when they first spotted the pickup truck on the Thruway, until 9:00 P.M., when they stopped the truck, to obtain a search warrant. However, the police could reasonably have believed that they did not have sufficient corroboration of the informant's story to support the issuance of a warrant until 5:00 P.M. when the truck pulled into Schaller's driveway.[5] And, by then, they had no way of knowing how long it would be before the truck left for New York City. They could well have concluded that the truck would pull out in a matter of minutes.

While in hindsight it appears that the police would have had enough time to dispatch one of their number to secure a warrant while they waited outside Schaller's residence, the facts here do not bear out the defendants' contention that the police deliberately flouted the warrant requirement. Indeed, the defendants' position is inconsistent in this respect since, on the one hand, they assert that the police had probable cause to obtain a warrant at 2:00 P.M. and, on the other, they demand a hearing to determine whether probable cause existed to search the truck at 9:00 P.M.

We agree with the government that the facts here resemble more closely those of the classic "automobile exception" cases, *Chambers v. Maroney*, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970); *Carroll v. United States*, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925). In those cases, the Supreme Court held that when police officers have probable cause to believe that contraband is being transported in a vehicle on the highway, they may stop the car and search it, without a warrant, either immediately or at the stationhouse.

Here, the information of the informant, who appears to have been involved in Schaller's operation, and whose detailed description was corroborated at every point as events unfolded, gave the officers probable cause to believe that the pickup truck would contain contraband. Moreover, as discussed above, the pursuit of the truck resembled in its essential details the flight situation encompassed by the automobile exception cases rather than the delayed search of the stationary automobile in *Coolidge*. Accordingly, the search of the camper, which was loaded onto the back of the pickup truck, was valid.

## II. The Search of the Attache Case

■ The validity of the search of Schaller's attache case, which was found under the passenger seat of the truck, is more troubling in light of the Supreme Court's recent decision in *United States v. Chadwick*, 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977).[6] In that case, the Supreme

4. In concluding that the search in *Coolidge* violated the warrant requirement, the Court emphasized that there was no suggestion that the automobile there contained contraband: "And surely there is nothing in this case to invoke the meaning and purpose of the rule of *Carroll v. United States*—no alerted criminal bent on flight, no fleeting opportunity on an open highway after a hazardous chase, no contraband or stolen goods or weapons, no confederates waiting to move the evidence, not even the inconvenience of a special police detail to guard the immobilized vehicle." 403 U.S. 443, 462, 91 S.Ct. 2022, 2035, 29 L.Ed.2d 564.

5. Moreover, it would have been difficult for the police to obtain a warrant between 2:00 P.M. and 5:00 P.M. since they were following the

pickup truck during this time and could not be certain that the truck would actually arrive at the destination described to them by the informant.

6. The defendants argue that *Chadwick* bars the search not only of the attache case but of the camper as well. However, the Court in *Chadwick* specifically addressed itself only to the privacy interest accompanying luggage. Here, the camper, which was loaded onto the pickup truck, was for all intents and purposes a part of the truck. What is crucial for purposes of the automobile exception is that the camper therefore shared the mobility of the truck. Therefore, we do not agree that the same considerations which the Court held attached to a small piece of personal property are applicable to

Court held that the stationhouse search of a double-locked, 200 pound footlocker, which was seized from the trunk of a stationary vehicle, more than an hour after the arrest of the footlocker's owner, violated the Fourth Amendment. In the course of the opinion, the Court emphasized that special privacy interests attach to luggage which justify increased protection from search.[7]

For several reasons, it would be inappropriate to interpret *Chadwick* to bar the search of the attache case here. First, in holding that luggage is entitled, in certain situations, to special treatment, *Chadwick* extends the "expectation of privacy" theory of the Fourth Amendment, but the limits of that extension are unclear. Second, in *Chadwick* the automobile exception was not argued before the Supreme Court and, accordingly, the opinion is not applicable on this point.[8] Indeed, in a recent (although pre-*Chadwick*) decision, the Court of Appeals for the Second Circuit held that police officers may search a suitcase found in an automobile for contraband as freely as they would any other container under the automobile exception. *United States v. Tramunti*, 513 F.2d 1087, 1104–05 (2d Cir. 1975), *cert. denied*, 423 U.S. 832, 96 S.Ct. 54, 46 L.Ed.2d 50 (1975). Because *Chadwick* fails to address the automobile exception, the approach taken in *Tramunti* toward searches of luggage in automobiles may well survive the Supreme Court decision.

Finally, with regard to pre-indictment matters, a district court should not grant a motion to suppress unless there is strong reason to believe that the search was unlawful. *Hunsucker v. Phinney*, 497 F.2d 29 (5th Cir. 1974); *Fifth Avenue Peace Parade Committee v. Hoover*, 327 F.Supp. 238, 242 (S.D.N.Y.1971).[9] Accordingly, we find that the search of the attache case was proper.

### III. Necessity for a Hearing

■ The defendants argue that an evidentiary hearing is necessary to determine whether the police had probable cause to believe that the pickup truck contained contraband. Such a hearing would focus on the question whether the information obtained from the informant was reliable as required by *Spinelli v. United States*, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969); *Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964).

A hearing would be superfluous since the undisputed facts already provide ample evidence of the reliability of the informant. The informant was himself a participant in the enterprise involved in this case. Moreover, the detailed description of the pickup truck, including its year, make and registration number, and the exact route followed by the truck to Schaller's residence was fully corroborated by the observations of the agents. These factors are sufficient to justify reliance on the informant's story.

part of a motor vehicle. This is particularly evident since the Court itself distinguished between luggage and automobiles in *Chadwick*. See note 7 *infra*.

7. This emphasis was made clear by the Court's discussion as it rejected the government's attempt to analogize luggage to automobiles:

"The factors which diminish the privacy aspects of an automobile do not apply to respondents' footlocker. Luggage contents are not open to public view, except as a condition to a border entry or common carrier travel; nor is luggage subject to regular inspections and official scrutiny on a continuing basis. Unlike an automobile, whose primary function is transportation, luggage is intended as a repository of personal effects. In sum, a person's expectations of privacy in personal luggage are substantially greater than in an automobile.

"Nor does the footlocker's mobility justify dispensing with the added protections of the Warrant Clause. Once the federal agents had seized it at the railroad station and had safely transferred it to the Boston federal building under their exclusive control, there was not the slightest danger that the footlocker or its contents could have been removed before a valid search warrant could be obtained." 433 U.S. 1, 13, 97 S.Ct. 2476, 2484, 53 L.Ed.2d 538 (1977).

8. See 433 U.S. 1, 3, 10, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977).

9. Moreover, a decision against the defendants in this situation is not final since they may later move to suppress the evidence if they are indicted.

*United States v. Rollins*, 522 F.2d 160 (2d Cir. 1975); *United States v. Sultan*, 463 F.2d 1066 (2d Cir. 1972). Accordingly, we believe that there was probable cause to stop the pickup truck.

Because we find that the search of the pickup truck was legal, it follows that the search of Schaller's residence, pursuant to a warrant, is valid as well. Therefore the motion to suppress is denied.

It is so ordered.