UNITED STATES of America

v.

**James McGRATH et al., Defendants.**

**78 Cr. 315 (HFW).**

United States District Court,
S. D. New York.

Oct. 3, 1978.

See also D.C., 459 F.Supp. 1271.

Robert B. Fiske, Jr., U. S. Atty. for the S. D. of New York, New York City, for the United States of America; by George T. Manning, Kenneth V. Handal, Asst. U. S. Attys., New York City, of counsel.

Howard L. Jacobs, New York City, for defendant John Schaller.

Gerald B. Lefcourt, New York City, for Bruce Buckle.

Michael Kennedy, New York City by Paul Casteleiro, New York City, of counsel for James McGrath.

## MEMORANDUM DECISION

WERKER, District Judge.

Defendants Buckle, Schaller and McGrath have moved to suppress evidence seized from them on the evening of January 31, 1978. These defendants previously moved to suppress the same evidence prior to indictment under Rule 41(e) before Judge Lasker. He denied their motion in a nine page opinion, *United States v. McGrath et al.* 448 F.Supp. 1338 (S.D.N.Y.1978).

Briefly summarized, the facts as found by Judge Lasker are as follows. Drug Enforcement Administration ("DEA") agents arrested a man on January 30, 1978 who possessed approximately 20 pounds of marijuana. He agreed to cooperate with the agents and informed them that one Jack Schaller was going to transport 1100 pounds of marijuana from Hurley, New York to

New York City. The informer provided other details such as a description of the vehicle to be used, its registration number, and the route to be followed.

On January 31, 1978 the agents and the state police positioned themselves on the New York Thruway, spotted the previously described pickup truck at 2 p. m. and followed it. The truck stopped at a Volkswagen dealership and was joined by a Volkswagen auto. The agents checked the registration numbers and learned that James McGrath owned the pickup truck and John H. Schaller the auto. Both vehicles proceeded to Schaller's residence, arriving at 5 p. m. Police in aircraft surveilled the car and truck while DEA agents and ground police waited at the end of Schaller's driveway for the truck, expected to contain marijuana, to depart for New York City. When the truck left the Schaller residence around 9 p. m. the police stopped it on the public road, forced Schaller and the driver out of the truck, and searched them and the locked camper that was loaded upon the rear of the truck. Almost 700 pounds of marijuana were discovered in the camper. Schaller's briefcase containing books and records was also seized from under the front passenger seat of the truck.

After the above transpired, a warrant was obtained to search the Schaller property, including the barn, house and any vehicles on the land. Affidavits in support of that warrant were prepared during the period when the agents and police were awaiting departure of the truck from the property. When Schaller's residence was searched, various records, ledgers, notebooks, cash, guns and approximately 3300 pounds of marijuana were discovered.

Arguing that the police had ample time from 2 p. m. until 9 p. m. to obtain a warrant to search the pickup truck, defendants sought suppression of the truck's contents. They also moved to suppress all items seized from Schaller's property as fruits of a prior illegal search since the warrant was secured based upon evidence seized from the truck. Judge Lasker, citing *Chambers v. Maroney,* 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970) and *Carroll v. United States,* 267 U.S. 132, 45 S.Ct. 280, 69

L.Ed. 543 (1925), found the facts to resemble those of the "automobile exception" cases and sustained the search of the camper. He also rejected defendant's contention that, under *United States v. Chadwick,* 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977), the briefcase was impermissibly searched. As a consequence of these findings the search of the Schaller residence pursuant to the warrant was also upheld. These conclusions were reached without the necessity of an evidentiary hearing as to whether probable cause existed to believe the truck to contain contraband. Such a hearing, the court noted, would have been superfluous since the undisputed facts provided evidence that the informer was reliable and was a participant in the instant enterprise, and since the description given by him of the pickup truck and route was corroborated by the agents' own observations.

*Discussion*

I stated on the record at the pretrial conference of September 5, 1978 that I was in accord with the above conclusions. At that juncture counsel for defendant Buckle requested that a tape of three phone conversations not presented to Judge Lasker but subsequently received by defendants during discovery be heard and considered by the court in support of defendants' motion to suppress. The three conversations were between (a) the informer and one "Joan" (de la Cova); (b) the informer and one "Jimmy" (McGrath); and (c) the informer and one "Scott" (Cooper).

It was urged by defendant's counsel that this tape contained the details of the planned trip to upstate New York, that such details were fully known to government agents when these telephone calls occurred at approximately 12:40 a. m. on January 31, 1978, and therefore that sufficient probable cause existed at that time to believe that the following day the truck would contain contraband. Hence it is contended that the search of the pickup truck the following evening was a planned warrantless search and that a search warrant for the truck should have been obtained during

the 20 hour hiatus between the taping of the conversations and the search and seizure of the truck.

Contrary to defense counsel's representations that the "where," "when," "license plate number" and destination of the truck were on tape (Tr. 60), no such detailed information was discussed. In light of this, a short synopsis is in order.

In the first conversation, Joan asks the informer if he is looking for Jack. After the informer says that he is, Joan reveals that Jack is at Scott's waiting for him. Joan continues that at midnight Jack said he was at Scott's, waiting for the informer to come in. The informer says he will give Jack a buzz down there later.

During the second conversation the informer asks Jimmy if he has "brought that shit up there today" and Jimmy responds in the negative but says he has found a "good place to stash it down here." The informer asks Jimmy if he is going to "bring some good ones down for me tomorrow" and Jimmy answers in the affirmative. The conversation continues with the informer indicating that he wants to "check them out," wants "twenty-five good ones," and wants to "go through them." Jimmy says he will mark off five or six for the informer, or whatever the informer wants to keep away from Scotty. The conversation continues in discussing quantity, picking through them,[1] and where they should be put. Jimmy indicates that he was lucky that he got everything that was in the truck, and that there is not enough room to unload and go through it. The informer indicates that if he continues to give his people the good ones they will not take the "shitty ones" in the end. He continues that if he tells them that the rest are not "that good" maybe they will look through the "bad ones." and Jimmy can move them out instead. He reminds Jimmy that they could make "more bucks" on the "better ones." Jimmy responds that all they need is a place for the informer to look through them. When asked what time he is going upstate tomorrow Jimmy indicates that he has to wait for Jack to "finish this business down here,"

answers affirmatively that Jack is going with him and states that he told Jack to get finished early. Jimmy continues that he will be "shooting right out" and answers "exactly" when the informer asks if he is going to "shoot up there tomorrow morning and then tomorrow afternoon some time we'll get together and take care o' all o' this shit." The informer asks Jimmy if he hopes to leave at nine or ten and Jimmy says that he hopes to. Jimmy states that he will call the informer or try and reach him before he leaves for Jack's.

In the third conversation Scott indicates to the informer that Jack is present at Scott's house and that Sal is looking for the informer concerning something important. Scott puts Jack on the phone who states that he has been "hanging out" for a couple of hours waiting for the informer. The informer replies that he did not know Jack would even be down here and that he just called Joan to see if Jimmy got up there. Jack retorts that Jimmy "fucked it up" and expresses his dissatisfaction because "those guys" are too "loose," "dumb," and "unprofessional" and do not run a tight organization. The informer states that he is not happy due to too many loose ends and Jack agrees, noting that he and Scotty were talking about how "we should approach this thing" and might be able to squeeze more out of them and make a "couple of extra bucks." The informer says they are being cheap and Jack agrees again, noting that they did not sell "any for a week," and that he kept "holding back." Then he refers to when he "sold that bunch," there is background noise, and Jack apologizes. The informer asks Jack if he is leaving tonight or will be in town; Jack says he is remaining and will go back tomorrow. The informer asks Jack if he will see Jack in a little while at his "man's," Jack answers yes and asks if the informer wants Jack to wait for him. They agree to meet at the "kid's" house on Crosby Street. Jack asks the informer how long he will be and the informer replies not more than 45 minutes. They further discuss where to meet and note the hour as

---

1. The word "marijuana" is not uttered during any of the conversations.

1:10 a. m. The informer states that the kid might be out, determines that Jack has the keys to the kid's house, and it is resolved that they will meet there and talk as soon as the informer can come over.

\* \* \* \* \* \*

It is clear from the tapes that by no stretch of the imagination are the details of the trip to Hurley to pick up the marijuana revealed. There is reference to a "truck" and to "Jimmy" and "Jack" going "upstate." However, there is an utter void of specific information relating to a description of the truck for which counsel so strenuously argues a warrant should have been gotten. There is no reference to a license plate number, or model or year or location of the "truck" to be used. In short, while the tape does corroborate what the informer revealed to DEA a few hours previously concerning the existence of plans for the next day's excursion to obtain marijuana, it in no way furnishes any specific details about a vehicle which would justify a finding of probable cause for obtaining a search warrant for the truck.

■ Indeed, based upon both the materials submitted *in camera* subsequent to the court's hearing of the tape and upon Agent Marvin Siegel's testimony, it is apparent that not until the next afternoon did government agents learn the year, make, style, ownership and license number of the truck. Further, this information unfolded while the truck was en route to upstate New York. Immediately upon receipt of this description the law enforcement officers themselves proceeded north in attempting to locate the moving vehicle.

After having considered all the evidence adduced at the suppression hearing, I must reject the contention that a "planned warrantless search" occurred. This is not a factual situation similar to that in *Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1970). There the Court rejected a warrantless search of the arrestee's automobile at the station house. This was subsequent to the seizure of the immobilized auto from defendant's driveway and his arrest and removal from the premises. In that context the Court held no exigent circumstances existed, the automobile exception was irrelevant, and a warrant should have been obtained prior to the search.

Here, the truck was not stationary but in use from approximately 1:45 p. m. when its identity first became known until approximately 5 p. m. when it arrived in Schaller's driveway. After that time the truck was driven a number of times between Schaller's house and the barn, and no information concerning departure was available to Agent Siegel until around 6 p. m. when the informer spoke with him by phone and stated that Schaller would be leaving at approximately 8 o'clock. When the truck did not leave by 8:45 p. m., Siegel left for the police barracks in Kingston, New York to execute an affidavit for a search warrant for both the vehicle and Schaller's residence. At this time there was no further information as to departure time available. Siegal later learned that the truck was in fact driven away from Schaller's residence and stopped and searched outside the property around 9 o'clock by other agents. To quote Judge Lasker, "the pursuit of the truck resembled in its essential details the flight situation encompassed by the automobile exception cases rather than the delayed search of the stationary automobile in *Coolidge.*" At 1341.

Finally, although the informer, along with Schaller and McGrath (whose conversations had been taped hours earlier), could be regarded as reliable as participants in the marijuana scheme, *United States v. Rueda*, 549 F.2d 865 (2d Cir. 1977), it was not unreasonable for the agents to await corroboration of the statements as the day's events occurred in order to establish probable cause to believe that the truck would be used to transport contraband. This is particularly so when it is considered that although McGrath explicitly indicated on the tape that he would be travelling upstate the next morning with Schaller, in fact it was defendant Buckle instead who rode with Schaller in the truck.

For the foregoing reasons I hold that the warrantless search of the truck was proper.

The quantity of marijuana seized from its rear will not be suppressed.

### The Briefcase

It is argued that the warrantless search of Schaller's briefcase after its removal from the area near the truck's passenger seat is constitutionally infirm under *United States v. Chadwick*, 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977), where the Supreme Court invalidated a warrantless search of a 200 pound double locked footlocker. There the defendants were arrested and their footlocker seized at a Boston railway station while they were loading it into the trunk of a car after federal agents received information leading them to believe that the footlocker contained drugs. The arrest occurred before the car's engine was started and while the trunk was still open. The agents took the defendants and the footlocker to the Federal Building in Boston where they searched the footlocker without a warrant approximately an hour and a half after the arrest. Under these circumstances the Court rejected the warrantless search, finding it neither incidental to arrest nor validated by any exigency. The Court stated:

> "Once law enforcement officers have reduced luggage or other personal property not immediately associated with the person of the arrestee to their exclusive control, and there is no longer any danger that the arrestee might gain access to the property to seize a weapon or destroy evidence, a search of that property is no longer an incident of the arrest.

> Here the search was conducted more than an hour after federal agents had gained exclusive control of the footlocker and long after respondents were securely in custody; the search therefore cannot be viewed as incidental to the arrest or as justified by any other exigency. Even though on this record the issuance of a warrant by a judicial officer was reasonably predictable, a line must be drawn. In our view, when no exigency is shown to support the need for an immediate search, the Warrant Clause places the line at the point where the property to be searched comes under the exclusive do-

minion of police authority. Respondents were therefore entitled to the protection of the Warrant Clause with the evaluation of a neutral magistrate, before their privacy interests in the contents of the footlocker were invaded."

433 U.S. at 15, 97 S.Ct. at 2485 (footnotes omitted).

██ The question to be determined in this instance, then, is whether the law enforcement officers had reduced the briefcase to their exclusive control thereby triggering the warrant requirement of *Chadwick*. See *United States v. Stevie*, 582 F.2d 1175 (8th Cir. 1978), *rev'ing en banc United States v. Stevie*, 578 F.2d 204 (8th Cir. 1977). The testimony of Agent Edward A. Mattson, the officer who seized and searched the briefcase, reveals that exclusive control was initially obtained by him at the situs of the arrest.

After the truck left Schaller's residence, agents stopped it on Dug Hill Road. With the officers each taking a side of the truck, Agents Greeley and Brereton ordered Schaller and Buckle out of the truck and arrested them. They were handcuffed and removed to a government vehicle, and agents seized the marijuana from the truck's rear. The right front door of the truck was secured, and Agent Mattson took the keys. Subsequent to the time that defendants were handcuffed and placed inside the government vehicle, Agent Mattson first spotted the briefcase on the floor as he was preparing to drive the truck to the Kingston police barracks. (The testimony is disputed as to whether the case was buckled. Mattson contends it was not; Schaller states that it was. In any event, all appear to concur that the front flap was down, and there is no assertion by the government that the contents of the case were in plain view.) According to Mattson he picked up the briefcase and looked inside for inventory purposes while he was seated in the truck with the light on. A perusal of the contents revealed personal property such as papers, a notebook, a calculator, and other items. No large amounts of money, other valuables or guns or explosives were

contained in the case. Mattson thereafter drove the truck to the Kingston police barracks and gave the case to Agent Siegel. The briefcase was then transported down to DEA headquarters in New York City and locked in an office vault while Siegel accompanied defendants to a correctional facility. Upon his return to DEA headquarters later that night Siegel retrieved the briefcase and conducted an inventory search of its contents.

The above facts as I have found them reveal that Agent Mattson first obtained exclusive control over the briefcase when he was inside the truck. The vehicle was fully immobilized, Mattson was in possession of its keys, and the two defendant passengers were manacled and secured in another vehicle by the agents. At this point it was impossible for defendants to gain access to the contents of the case, and there was no danger that the contents would in any way be lost or destroyed. Furthermore, nothing in the evidence revealed that there was any reason for Mattson to believe that his own physical safety was in jeopardy due to inherently dangerous contents which might justify an immediate warrantless search. *See United States v. Chadwick*, 433 U.S. at 15 n. 9, 97 S.Ct. 2476. (Court noted that where officers have cause to believe that a piece of luggage contains "some immediately dangerous instrumentality, such as explosives," it would be permissible to open the luggage and disarm the weapon.)

Under these particular facts there were simply no exigent circumstances. I find that neither the automobile exception to the warrant requirement, *see United States v. Finnegan*, 568 F.2d 637, 640–42 (9th Cir. 1977), nor the government's theory of a routine inventory search, *see South Dakota v. Opperman*, 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976), justifies the warrantless searches of the briefcase. Hence Mattson's search as well as Siegel's subsequent inventory search at DEA headquarters were violative of defendant Schaller's fourth amendment right against unreasonable searches and seizures. Accordingly, the contents will be suppressed.

*The Subsequent Search Warrant*

■ A careful examination of the Siegel and Van Wagenen affidavits submitted in support of the application for a search warrant for Schaller's residence discloses no reference to the briefcase or its contents. Consequently any argument that those affidavits are tainted is untenable.

In conformity with the above, the motion to suppress the evidence seized from the truck, with the exception of the contents of the briefcase, is denied.

SO ORDERED.

ON FURTHER CONSIDERATION

■ In a memorandum decision of September 19, 1978 the court, after conducting a hearing, granted a motion to suppress a briefcase and its contents as illegally searched under *United States v. Chadwick*, 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977). Subsequently a factual dispute arose concerning whether a "Columbia" spiral notebook[1] was taken by government agents from that briefcase or from defendant's residence, which had been searched pursuant to a search warrant. This issue necessitated a further hearing that commenced on September 20 and continued the following day. Based upon the evidence adduced at the hearings, I have concluded that the government has not sustained its burden of proving by a preponderance of the evidence, *see United States v. Matlock*, 415 U.S. 164, 177–78 & n. 14, 94 S.Ct. 988, 996, 39 L.Ed.2d 242 (1974), that the notebook was lawfully seized from the residence. Rather, I find that the notebook was taken from the briefcase; the following constitutes my findings of fact.

Agent Mattson was the first officer to open the briefcase after the arrest of defendants Schaller and Buckle. He did so in the truck, with the light on, and saw envelopes, papers, a toothbrush and toothpaste, a check statement or deposit slip, a calculator, and a spiral notebook. He did not recall having seen the Columbia notebook, government exhibit 101, inside the

---

1. The subject notebook is essentially an inventory of defendant Schaller's drug transactions.

briefcase and testified that the spiral notebook he had seen was much smaller. Although the parties agreed that government exhibits 108 and 109, two small spiral notebooks, were removed from the briefcase, Mattson could not recall two and only recalled having seen one when he looked into the case. Later that evening at the Kingston police barracks he gave the briefcase to agent Siegel. Mattson was not present when Siegel opened it back at Drug Enforcement Administration ("DEA") headquarters in New York City during the early morning hours of February 1, 1978. The next time he saw the items from the briefcase was February 10, 1978 at headquarters when Siegel sealed the calculator and two small spiral notebooks to be used as evidence. At the time Siegel sealed these items Mattson did not see the Columbia notebook come out of the briefcase. From February 1 until February 10 the briefcase and its contents were stored in Siegel's office vault where Mattson had observed the case during those ten days. Mattson indicated that everyone in his DEA group has access to the vault.

On the evening of the arrest investigator Van Wagenen was responsible for execution of the search warrant for Schaller's house. He was not present when the truck was stopped. Afterwards he went with about six or seven officers to Schaller's residence. At that time agent Siegel arrested Joan de la Cova and they left for the Kingston police barracks while Van Wagenen remained at the house with other officers to search it. He instructed each officer not to remove or handle any piece of evidence without his seeing and inventorying it first. One officer went upstairs to ensure that no one had remained in the house and called Van Wagenen to join him. In one room large burlap bags of marijuana were found. Van Wagenen proceeded from room to room and in an office on the second floor discovered large amounts of marijuana and many written records. He took a yellow suitcase from the house to carry the seized records which were all gathered from the upstairs room. He also made an inventory of items seized, although he stated that several items he recalled seizing were not listed on the inventory sheet. Van Wagenen recalled seizing a Columbia spiral notebook he had initialed, but stated, when shown the disputed Columbia notebook exhibit 101 without his initials, that he did not recall seizing it. When asked if he recalled having seen more than one Columbia notebook, Van Wagenen answered in the negative. He indicated that he very briefly looked into the books as he seized and inventoried them; when asked if based upon his twenty years of work experience he would take note of computations concerning marijuana transactions in such books, he answered that he would. After being confronted with the Columbia notebook exhibit 101, he answered in the affirmative when asked if the computations contained therein obviously referred to marijuana and if he would describe the entries as "ledgers." He also stated that if he had seen that book, noticed what was in it and had not initialed and dated it, he had "goofed." Van Wagenen continued that he had not checked through the suitcase to see if all items were marked, and also had not initialed three address books since their covers were not conducive to ink, although he had numbered them on the inventory sheet. When shown a red check book in the name of John Schaller II, Van Wagenen did not specifically remember it although he had seized checks that were not loose. When questioned concerning Schaller's briefcase, he indicated that he had not seen it on the night the search was made.

When Van Wagenen was finished packing items into the yellow suitcase he gave the suitcase to officer Hansen, at Schaller's residence, between 1 and 2 a. m. on February 1. Van Wagenen never saw the yellow suitcase again until September 21, 1978 and had no idea how many people in the interim had inserted and removed items from it. Additionally, Siegel informed him approximately two to three weeks after the latter became involved in the investigation that Siegel could not speak to him about the items seized, although recently Siegel had asked Van Wagenen for a signed copy of the more brief inventory return on the search warrant.

The agent who ultimately obtained possession of both the briefcase and the yellow suitcase, Siegel, also testified at the hearings. He revealed how the suitcase, briefcase, and the contents of each were dealt with at DEA headquarters in New York City.

Siegel did not remember at what point he received the briefcase from agent Mattson but recalled having gotten it before 3 a. m. on February 1. He did not recall anyone else having had possession of it. At DEA headquarters he locked it in his office safe and accompanied the defendants to the Metropolitan Correctional Center. Upon returning to headquarters he removed the briefcase from the safe and opened it, at approximately 5 or 6 a. m. Siegel was alone at this time. He saw a toothbrush with a container and a small spiral ledger book. He stated, when shown the Columbia notebook exhibit 101, that that Columbia notebook was not in the briefcase when he obtained custody of it. At headquarters he did not make an inventory of the contents but put them back into the briefcase and placed the briefcase in the safe again because he felt that the contents might be considered evidence.

Around 3 p. m. on February 1 agent Hansen brought the yellow suitcase to Siegel's office. Siegel returned from court about an hour thereafter and did not recall whether he opened the suitcase at that time or several days later. He used his locker rather than his office safe to store the suitcase due to its size. When Siegel opened the unlocked suitcase it either contained Van Wagenen's inventory list or the inventory was on his desk with the suitcase. He removed the items from the suitcase and attempted to match them to the list. He did not proceed in any particular manner in doing this, and he noticed discrepancies between the list and the contents. For example, he found a spiral notebook with Van Wagenen's initials on it but no number, so he wrote the numerals 21 on it after verifying that the inventory list specified number 21 as a spiral notebook. He could not locate the objects listed by Van Wagenen on the list as numbers 34 and 35. (The Assistant United States Attorney found item number 34 in the suitcase lining and item number 35 behind a legal pad immediately prior to the hearing and produced those items.) Item 30 on Van Wagenen's list was a Columbia spiral notebook. Siegel picked up the now disputed exhibit 101 Columbia notebook. Van Wagenen's initials and the number 30 were missing from the face of the book so Siegel wrote the numerals 30 on the book cover to make it correspond with Van Wagenen's item 30 on the inventory list. After this was done, however, he saw another Columbia notebook which was already numbered 30 and which did contain Van Wagenen's initials. Despite this he left the number 30 he had written on exhibit 101, and he never questioned Van Wagenen about why there were two Columbia notebooks although only one appeared on Van Wagenen's list. When asked where the briefcase items were located while he was sorting these suitcase items, Siegel replied that to the best of his knowledge they were in his office safe. After Siegel was finished sorting the suitcase items he placed them back into the suitcase and put the suitcase in his locker.

Subsequently, on February 9 and 10, Siegel, with agent Mattson, removed the evidentiary materials from the suitcase and the briefcase, inserted the items into plastic bags, sealed them, and placed evidence stickers on them to indicate the date of sealing. This was the first time Siegel made a list of the items in the briefcase. During the almost 10 day period between his first look into the briefcase on February 1 at 5 or 6 a. m. and the time he removed the briefcase's contents for sealing, Siegel said that he may have removed the briefcase once or twice from the safe. He also stated that he could not say whether he took it out at all and just could not recall.

Undisputed evidence at the hearing revealed that some of the items from the briefcase were sealed into evidence by Siegel and Mattson on the same day that items seized from the house and placed in the yellow suitcase were sealed into evidence. Mattson testified that he did not recall the Columbia notebook exhibit 101 having been taken out of the briefcase the day it was

sealed; Siegel, when asked about the fact that items from both the suitcase and the briefcase were sealed the same day, indicated that he was positive that he did not commingle the contents.

Defendant Schaller testified at the suppression hearings of September 18 and September 21. His testimony from the September 18 hearing is particularly relevant since at that time the parties were unaware of the existence of any factual dispute concerning the contents of the briefcase. At that time Schaller described how he and defendant Buckle were arrested and the briefcase seized. He then described the contents of the briefcase as a red checkbook, calculator, toothbrush, bank forms, business cards, miscellaneous items and three spiral notebooks, one of which was a large one that had printed "Columbia University" on the outside and had his name on it. He also stated that he had asked agent Greeley, an arresting officer, for his checkbook back on the night of the arrest. This was done in the hopes of retrieving the entire briefcase instead.

Schaller again testified on September 21 that his Columbia notebook, exhibit 101, was in the briefcase the night the case was seized from the truck. He said that he had brought the notebook and a calculator up from New York City to Hurley in the briefcase. While in his house at Hurley on the afternoon of January 31 he removed the notebook, some yellow sheets, and the calculator. On a page of the notebook denominated "third shipment" he made notations. The page containing the words "third shipment" was an inventory referring to the bales of marijuana to be loaded that evening in the truck bound for New York City. Schaller made notations next to the bales listed on the "third shipment" page to indicate the individual to whom the bales would be taken and to mark off the weight sent. He stated that he used the calculator to keep a running count of the weights. This was done on Schaller's dining room table after the bales of marijuana were placed on the floor of that room. Schaller stated that when he was finished, he put the calculator and Columbia notebook exhibit 101 back into his briefcase. He did this because if an

individual were to reject a bale of marijuana upon receipt, he would have to make a notation to that effect in the notebook in order to keep an accurate inventory. Schaller indicated that there was no doubt in his mind that the Columbia notebook exhibit 101 was in his briefcase at the time of his arrest. He was also certain that his red personal checkbook was in the briefcase along with the Columbia notebook. When asked about why he would carry in his briefcase a notebook containing so complete an inventory, including transactions dating back to 1976, Schaller indicated that the briefcase was the place he used to keep current records. To use his words, the briefcase was his "traveling office."

Agent Greeley was questioned as to whether Schaller had asked for his checkbook or briefcase. At first he answered in the negative and upon further questioning stated that he really could not recall whether Schaller had asked for anything.

## DISCUSSION

Defendant Schaller's testimony, particularly that of September 18 when no one knew there was a factual dispute as to where the subject notebook was found, is quite convincing. That testimony is indirectly but significantly bolstered by that of investigator Van Wagenen. Van Wagenen set out to conduct a meticulous house search. He ordered his group members not to handle or remove evidence before he initialed and inventoried it. He carefully initialed almost every record taken from the house except those with covers not conducive to ink marks. He also did not initial or inventory an empty green notebook, an immunization card and a checkbook taken from the second floor of the house. He did, however, recall taking them and throwing them into the yellow suitcase. He did not recall seeing *more than one* Columbia notebook. Moreover, he admitted that a notebook such as exhibit 101, with its copius notes concerning drug transactions, is not the type of book that is easily overlooked after a scanning by one who has been a law enforcement officer for almost twenty

years. Additionally, Van Wagenen specifically testified that the seized written records came from the upstairs office. There was no testimony concerning records seized from the dining room, the very room where Schaller had removed the Columbia notebook from the briefcase to make inventory notations. Further, when Van Wagenen spoke of seizing a checkbook, he did not remember a red cover, only that the checks were in the name Schaller or Whiskey River Fish Company. The red checkbook which Schaller argues was in the briefcase did not contain Van Wagenen's initials, and Schaller testified to storing other personal and Whiskey River checks, as opposed to his personal current checkbook, in the house.

I am also unconvinced that the items in the yellow suitcase and in the briefcase were treated by agents Mattson and Siegel as the products of two discrete seizures at DEA headquarters. When agent Siegel opened the briefcase and viewed the contents, he did so at approximately 5 or 6 a. m., alone, after working intensively throughout the entire night and without having slept. More importantly, at that time he failed to make an inventory report of the contents of the briefcase. It was not until approximately 10 days later, when he sealed into evidence those contents plus the suitcase contents, that the first written record of any kind was made. He could not recall whether he removed the briefcase from his safe, or if so on how many occasions during those ten days. While the briefcase was in the safe during that time, it was unsealed. Further, Siegel did not have exclusive access to the safe—other agents in the group also had access to it.

When Siegel commenced checking the contents of the suitcase against Van Wagenen's inventory list, he did not proceed in any particular, orderly manner. In fact, as noted above, he did not even find two items on Van Wagenen's list. Instead, the Assistant United States Attorney found them prior to the hearing after the suitcase was brought to the United States Attorney's Office. Moreover, although Siegel acknowledged that discrepancies existed between Van Wagenen's list and the contents of the suitcase, he admitted that he never

once contacted Van Wagenen for a clarification or explanation but instead made what he considered to be corrective notations on the items himself. The manner in which the Columbia notebook exhibit 101 was treated is the prime example of this. Considering the important evidentiary nature of that notebook's contents, certainly an inquiry was mandated as to why no initials and number appeared on the book's face. This is particularly so in light of the fact that Siegel did locate another Columbia notebook which had obviously been taken by Van Wagenen and inventoried as item number 30.

When Siegel decided to seal into evidence the various items from the suitcase and the briefcase, once again no orderly procedure was followed. Although the agents appear to be adamant that no commingling of contents occurred, it is established that items from both the suitcase and the briefcase were sealed on the same day. The evidence further showed that the disputed Columbia notebook was treated differently in the sealing process than the other seized books. Instead of placing the notebook into a plastic bag as the method of sealing, Siegel placed evidence tape around it. He testified that to the best of his knowledge exhibit 101 was the only book he sealed in such a manner. And, as I have already indicated, I find the testimony of Siegel and Mattson so ambiguous as to the sealing process that I am convinced there was ample opportunity for non-intentional commingling of records.

Having carefully weighed the evidence and arguments submitted by the government and defendant Schaller, I find that the government has failed to sustain its burden by a preponderance of the evidence. I therefore find as a matter of fact that the subject notebook was seized from Schaller's briefcase and must be suppressed.

SO ORDERED.

ON "STANDING"

In a memorandum decision of September 19, 1978, I suppressed the contents of a briefcase as illegally searched under *United*

*States v. Chadwick,* 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977). The relevant facts surrounding the search are contained in that decision and will not be reiterated at length here. Defendants McGrath, Schaller and Buckle took an active role in the suppression hearing, as they also did in a subsequent hearing necessitated by a question of fact concerning whether a certain Columbia spiral notebook was contained in the briefcase. After I concluded that the notebook was seized from the briefcase, the government for the first time challenged the standing of McGrath and Buckle to contest the constitutional validity of the briefcase search. However tardy the instant standing motion may be viewed by those defendants, the issue is nevertheless properly before the court to determine as a question of law. *United States v. Tortorello,* 533 F.2d 809, 812 (2d Cir.), *cert. denied,* 429 U.S. 894, 97 S.Ct. 254, 50 L.Ed.2d 177 (1976); *United States v. Banerman,* 552 F.2d 61, 63 (2d Cir. 1977).

## DISCUSSION

■ The Supreme Court has stated in *Brown v. United States,* 411 U.S. 223, 93 S.Ct. 1565, 36 L.Ed.2d 208 (1973), that defendants will lack standing to attack a search and seizure where they:

"(a) were not on the premises at the time of the contested search and seizure; (b) alleged no proprietary or possessory interest in the premises; and (c) were not charged with an offense that includes, as an essential element of the offense charged, possession of the seized evidence at the time of the contested search and seizure."

*Id.* at 229, 93 S.Ct. at 1569. In the present case there is no issue of "automatic standing" under (c) above since neither McGrath nor Buckle is charged with possession of the contents of the briefcase. *See Jones v. United States,* 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960). The focus is thus upon (a) and (b) of the *Brown* rationale. In determining whether McGrath and Buckle lack standing under either test, the language of *Alderman v. United States,* 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1968), is instructive. "[S]uppression of the prod-

uct of a Fourth Amendment violation can be successfully urged only by those whose rights were violated by the search itself, not by those who are aggrieved solely by the introduction of damaging evidence." *Id.* at 174, 89 S.Ct. at 966. Stated differently, a defendant must show "that the evidence was seized as a result of an unlawful invasion of his own legitimate expectation of privacy in the place searched or in his person, papers, or effects." *United States v. Riquelmy,* 572 F.2d 947, 950 (2d Cir. 1978) (citations omitted). Ownership or possession of the property seized, or a substantial interest in the searched premises are the usual means of establishing standing. *Id.* Property rights alone, though, without a reasonable expectation of privacy in the property concerned, will not accord standing to assert a fourth amendment violation. *United States v. Hunt,* 505 F.2d 931, 941 (5th Cir. 1974), *cert. denied,* 421 U.S. 975, 95 S.Ct. 1974, 44 L.Ed.2d 466 (1975). With this in mind I now turn to the present case.

■ A brief synopsis of the relationship of McGrath and Buckle to the truck and the briefcase seized from its floor is appropriate to determine their respective interests in those items. On the evening of the arrest in Hurley, McGrath, the registered owner of the pickup truck, was not present. The truck was driven by defendant Buckle, with Schaller in the front passenger seat, when the agents stopped the truck on Dug Hill Road and searched it after Buckle and Schaller were ordered out of the vehicle. Schaller is the sole and undisputed owner of the briefcase and its contents; neither McGrath nor Buckle lays claim to the case or any of its contents. Given this set of facts, the government contends that even if McGrath and Buckle are held to have standing to contest the search and seizure of the truck and its interior, they nevertheless lack standing to contest the briefcase search by virtue of their lack of a possessory interest therein which would give rise to a legitimate expectation of privacy as to the contents of the briefcase. This position is a sound one for the following reasons.

McGrath, as owner of the vehicle, had a proprietary interest in the truck and a concomitant expectation of privacy, albeit a diminished one, *Cardwell v. Lewis,* 417 U.S. 583, 590, 94 S.Ct. 2464, 2469, 41 L.Ed.2d 325 (1974), therein. Since McGrath had lent the truck to Buckle, the latter was a bailee with a temporary possessory interest through his authorized use. As such, his lawful presence in the truck when it was stopped by the agents gives rise to the same reasonable expectation of privacy in the vehicle. *United States v. Edwards,* 577 F.2d 883, 892 (5th Cir. 1978), *vacating en banc United States v. Edwards,* 554 F.2d 1331 (5th Cir. 1977).

*As* to Schaller's briefcase and its contents, however, there can be no successful argument that either McGrath or Buckle had any proprietary or possessory interest, or legitimate expectation of privacy therein. Although they had a reasonable expectation of privacy in the pickup truck as the "premises" searched, that privacy expectation does not extend to cover Schaller's briefcase as a discrete, closed receptacle used exclusively by Schaller to store and transport his own personal effects. Since the essence of a fourth amendment violation is unwarranted governmental intrusion into the area where one possesses a reasonable expectation of privacy, *United States v. Chadwick,* 433 U.S. at 11, 97 S.Ct. at 2483; *United States v. Riquelmy,* 572 F.2d at 951, McGrath and Buckle must be regarded in this instance as attempting to assert vicariously Schaller's fourth amendment rights, because Schaller alone possessed in the briefcase and its contents a reasonable expectation of privacy that was violated by the warrantless search. Thus McGrath and Buckle, having suffered no breach of their own privacy expectations, are defendants "aggrieved solely by the introduction of damaging evidence." *Alderman v. United States,* 394 U.S. at 172, 89 S.Ct. at 965.

The status of McGrath and Buckle as Schaller's coconspirators does nothing to advance their claims of standing. " 'Coconspirators and codefendants have been accorded no special standing' to enforce the exclusionary rule." *United States v. Capra,* 501 F.2d 267, 281 (2d Cir. 1974), *cert. denied,* 420 U.S. 990, 95 S.Ct. 1424, 43

L.Ed.2d 670 (1975), *quoting Alderman v. United States,* 394 U.S. at 172, 89 S.Ct. at 965. Further, neither Buckle's presence in the truck with Schaller, nor the contention that the briefcase search was as much directed at McGrath and Buckle as it was toward Schaller, affords a reason why Buckle or McGrath should be found to have standing. *See United States v. Riquelmy,* 572 F.2d at 952 (fact that all defendants were traveling together at time of search and were treated by police as a unit did not give them standing to contest the search of an overcoat draped over the arm of one defendant).

For the above reasons, defendants McGrath and Buckle lack standing to challenge the constitutional validity of the search of Schaller's briefcase.

SO ORDERED.

See also D.C., 459 F.Supp. 1273.