UNITED STATES of America, Appellee,

v.

George OCHS, Defendant-Appellant.

No. 453, Docket 78–1163.

United States Court of Appeals, Second Circuit.

Argued Nov. 6, 1978.

Decided March 13, 1979.

---

See also D.C., 461 F.Supp. 1.

Peter D. Sudler, Asst. U. S. Atty., New York City (Robert B. Fiske, Jr., U. S. Atty., S. D. New York, Richard D. Weinberg, Asst. U. S. Atty., New York City, of counsel), for appellee.

Steven H. Gifis, Princeton, N. J., for defendant-appellant.

Before FRIENDLY, MANSFIELD and MESKILL, Circuit Judges.

FRIENDLY, Circuit Judge:

George Ochs was the subject of a seven count indictment filed in October, 1977 in the District Court for the Southern District of New York. Count One charged him with the use of extortionate means to collect a loan he had made to Debbie McElroy, in violation of 18 U.S.C. § 894. Count Two charged that he had obstructed justice by endeavoring to influence witnesses subpoenaed to testify before a grand jury, in violation of 18 U.S.C. § 1503. Counts Three through Five charged that he had falsely subscribed income tax returns for 1971, 1972 and 1973, in violation of 26 U.S.C. § 7206(1) by claiming personal exemptions to which he knew he was not entitled. Count Six charged him with failure to file his 1974 income tax return, in violation of 26 U.S.C. § 7203, and Count Seven charged him with evading his 1974 federal income taxes, in violation of 26 U.S.C. § 7201.

The Government's proof at a trial before Judge Cooper and a jury sufficiently demonstrated that during the years 1974 through 1976 Ochs owned and operated a New York City massage parlor and conducted a loansharking business and that in the course of his loansharking activities Ochs threatened to murder Debbie Frank McElroy, a prostitute whom he employed at his Studio One massage parlor, for failure to make interest payments on a usurious loan. The evidence further revealed several violations of the federal income tax laws. On his 1971, 1972, and 1973 tax returns Ochs claimed false exemptions for a non-existent wife and several children, and in 1974 Ochs received $25,000 in income from his prostitution and loansharking businesses which he did not report; indeed Ochs filed no tax return for 1974. Finally, while Ochs was being investigated by a federal grand jury sitting in the Southern District of New York, he approached witnesses who were subpoenaed to appear before the grand jury and instructed them to lie when questioned about payments of interest made on loans. Ochs instructed the witnesses in the alternative to refuse to testify before the grand jury by asserting their Fifth Amendment privilege.

The jury found Ochs guilty on all counts. Judge Cooper sentenced him to consecutive terms of imprisonment of seven years on Count One, five years on Count Two, three years on each of counts Three, Four and Five, and two years on Count Seven, for a total of twenty-three years.[1]

### I. *Search and Seizure*

The point for reversal most strongly pressed by Ochs is that he was the subject of an illegal search. After a two day hearing, the district court rendered an opinion denying suppression. 461 F.Supp. 1 (1978). The circumstances were as follows:

While cruising in a patrol car in the afternoon of September 5, 1975, in the vicinity of the B. Altman department store at Fifth Avenue and 35th Street in New York City, Police Officers O'Malley and Kelly were signalled by Theodore Bielefeld, the store's assistant director of security. He informed the officers that a "ring" of men, he believed three, were engaged in cashing stolen American Express travelers' checks and had just passed such checks in the store; that two of them were then seated in a blue Cadillac automobile parked on East 35th Street between Fifth and Madison Avenues and a third, known to Bielefeld as Julian Mitchell was no longer in sight; and that Ochs, whom Bielefeld described, had just brought to the store for refund goods procured by Mitchell with stolen American Express checks on the previous day but "for an unknown reason" had not obtained a refund and had left the refund counter. Bielefeld had observed Ochs enter the Cadillac. He showed the officers photostatic copies of stolen American Express checks in the name of O. Grable that had been cashed in the store the previous day and a picture of Mitchell. After Bielefeld had confirmed that the two men were still in the Cadillac, the officers approached it, O'Malley on the driver's side where Ochs was sitting, Kelly on the passenger side where one Liveo was seated. O'Malley perceived that Ochs fitted the description given by Bielefeld and observed that an open knife on the front seat between Ochs and Liveo. One of the officers opened the car and seized the knife, which they identified as a gravity knife, as defined in New York Penal Law § 265.00(5), possession of which is a misdemeanor, and if the possession is by any person previously convicted of crime,[2] a felony, *id.* § 265.02(1).

The officers then ordered Ochs and Liveo out of the car and frisked them without result. However, as O'Malley was frisking Liveo, he noticed a black object on the left front wheel well floor. Thinking this might be a weapon, he reached in and took possession of the object, which turned out to be a book of American Express checks in the

---

1. The judge suspended the imposition of sentence on Count Six which he regarded as a lesser included offense encompassed by Count Seven.

2. Ochs had five prior convictions.

name of O. Grable, identical with those used by Mitchell at Altman's.

After administering the *Miranda* warnings, the officers questioned Ochs about the ownership of the automobile. Ochs said it belonged to a friend but could not say where the friend was at the time. He produced a New York State driver's license and a registration certificate for the vehicle in the name of Otto Narday. O'Malley claimed that the upper portion of the registration certificate had been tampered with, a "7" having been changed to an "f".[3]

O'Malley tried to verify the car's legal status through the National Crime Information Computer but static interfered. Obtaining aid from another police car, O'Malley arrested and handcuffed Ochs and Liveo for possession of the gravity knife and removed them to the Midtown South station house. He also arranged to have one of the policemen drive the Cadillac to the same precinct, where it was "vouchered".

After having placed Ochs and Liveo in a detention cell, O'Malley and Kelly searched the Cadillac and made an inventory of its contents. The search yielded a .32 caliber starter's pistol, a simulated revolver, a scanning receiver (a device used to listen to police radio transmissions), a B. Altman sweater, a second book of stolen travelers' checks, and, in the footwells of the back seat, two unlocked briefcases which were taken into the police station. These were examined, without protest, in the presence of Ochs who was nearby in the detention cell.

One of the briefcases contained 8″ × 14″ ledger sheets, loose "index cards" bearing names and showing what appeared to be loans and payments, four bankbooks, two small notebooks containing loan records, and a calculator. The search of these papers appears to have been in two phases. The police first leafed through the papers to ascertain whether any contraband, money, valuables, etc. were mixed in among them. Then the police read some of the

papers, starting with the ledger sheets (the order after that is not clear). The loose ledger sheets were marked "Studio 1". Because he had been to a "Studio 1" before on police calls, Officer O'Malley was aware that there existed in the city a "Studio 1" which was a house of prostitution. However, no expertise was needed to detect that these sheets, containing the first names of women (styled "models"), times in and out, customer and "model" fees, were the records of such an establishment. In going through the bankbooks the officers observed that three of the books were in the names of persons other than Ochs or Narday. The police testified that upon noticing this discrepancy they came to believe that the bankbooks were stolen. The officers also examined the loose index cards, and went through the notebooks, which turned out to contain records of loansharking activities. Officer O'Malley testified that he had come upon a mention of "vig.", a standard term in loansharking for the penalty on a late payment, but, on being confronted with the books, was unable to locate anything more than a "v" before a date and a sum of money in the middle of one of them. All these items were seized. Ochs claims that the reading and seizure of the contents of the briefcase violated his rights under the Fourth Amendment.

The Government's first riposte is a challenge to Ochs' standing. As the briefs were filed and argument was had before the Supreme Court's decision in *Rakas v. Illinois*, —— U.S. ——, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978), the debate was couched in terms of *Jones v. United States*, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960) and *Brown v. United States*, 411 U.S. 223, 93 S.Ct. 1565, 36 L.Ed.2d 208 (1973), with Ochs relying on the fact that he was "legitimately on premises where a search occurr[ed]", 362 U.S. at 267, 80 S.Ct. at 734, this apparently being, in his view, when the automobile was seized. Under *Rakas* that alone is not sufficient, —— U.S. at ——, 99 S.Ct. 421. Now Ochs is obliged to show that he

---

**3.** Narday testified that in fact the car belonged to him, but that Ochs, to whom he was heavily indebted, could use it whenever he desired and in fact had it 90% of the time.

had a legitimate expectation of privacy with respect to the contents of the briefcases, and we must apply the teachings of *Rakas* in determining what constitutes such an expectation on the part of the users of an automobile.

■ The Court found that *Rakas* and King, his companion, who were merely passengers in a car driven by its owner, had no such legitimate expectation with respect to the objects seized in that car since "[t]hey asserted neither a property nor a possessory interest in the automobile, nor an interest in the property seized." —— U.S. at ——, 99 S.Ct. at 433. Ochs also asserted no interest in the property seized. Indeed, he declined the Government's invitation to submit a "possessory affidavit" at the suppression hearing.[4] He likewise asserted no proprietary interest in the automobile, although the Government claimed at trial that he was the *de facto* owner. However, the record shows that he had a possessory interest in the car. As indicated above, see note 3 *supra*, the record owner allowed him to use it whenever he wished and Ochs freely availed himself of the privilege. The very grounds on which the *Rakas* Court distinguished *Jones v. United States, supra,* work in Ochs' favor. Just as was the case with Jones and his friend's apartment, Ochs "not only had permission to use" the car but "had a key" to it. Except with respect to the owner, Ochs "had complete dominion and control" over the car "and could exclude others from it." We therefore reach his claim on its merits.

■ Ochs does not seriously dispute that the police had probable cause to arrest him both for trafficking in stolen travelers' checks and for being in possession of a gravity knife. Since we are here dealing with an automobile which, in sharp contrast to the car in *Coolidge v. New Hampshire,* 403 U.S. 443, 460, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971), *was* being used for an illegal purpose and was parked not in the driveway of the owner's house but on a public street, the police were entitled to search it on the spot for additional stolen checks and for weapons, even in areas that were not within "grabbing distance" under *Chimel v. California,* 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). See *id.* at 764 n.9, 89 S.Ct. 2034; *Chambers v. Maroney,* 399 U.S. 42, 50–52, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970). Moreover, the police were not required to make the search at that time and place. The car was illegally parked on a busy New York City street during the afternoon rush hour, and the police were entitled to take it and its occupants to the precinct, where a search could safely be made. *Chambers v. Maroney, supra,* 399 U.S. at 52 n.10, 90 S.Ct. 1975.

■ Once the car was there, the police had the same right to make a prompt search of it as they had before, since, given the probable cause to search that existed, "there is little to choose in terms of practical consequences between an immediate search without a warrant and the car's immobilization until a warrant is obtained." *Chambers v. Maroney, supra,* 399 U.S. at 52,

---

4. Despite the Court's refusal in *Rakas,* —— U.S. at —— n.1, 99 S.Ct. 421, to remand in order to afford petitioners another opportunity to claim a proprietary or possessory interest, we would be concerned about dismissing Ochs' Fourth Amendment claim on the basis of his failure to assert such an interest. At the time of the suppression hearing Ochs had reason to rely on the "legitimate presence" theory, and there was no occasion for him to assert that the briefcase and its contents were his when this seemed unnecessary to his suppression claim. Moreover, the Government asserted at trial that Ochs was the owner of the briefcase and its contents, as it had previously conceded that it would. It is not clear whether *Rakas* eliminates "automatic standing" in cases of prose-

cutorial self-contradiction, see —— U.S. at —— n.4, 99 S.Ct. 421, at —— n.6, 99 S.Ct. 421 (dissenting opinion). There was no such necessary self-contradiction in *Rakas* since the state could have contended that even if the defendants had neither a property interest nor possession, their knowledge or prior use of the rifle and shells had probative value. Justice White, in dissent, took the view that self-contradiction, —— U.S. at —— n.6, 99 S.Ct. 421, and the decision below, *People v. Rakas,* 46 Ill.App.3d 569, 4 Ill.Dec. 877, 360 N.E.2d 1252 (1977), indicates this. See 4 Ill.Dec. at 879, 360 N.E.2d at 1254. In light of our conclusion that Ochs had standing because of his possessory interest in the automobile, we find it unnecessary to resolve this issue.

90 S.Ct., at 1981. As said in the plurality opinion in *Coolidge, supra,* 403 U.S. at 463, 91 S.Ct., at 2036, "where the police may stop and search an automobile under *Carroll,* [*Carroll v. United States,* 267 U.S. 132, [45 S.Ct. 280, 69 L.Ed. 543] (1925)] they may also seize it and search it later at the police station." *Chambers* also teaches that "the mobility of the car [still obtains at the station house] unless the Fourth Amendment permits a warrantless seizure of the car and the denial of its use to anyone until a warrant is secured." 399 U.S. at 52, 90 S.Ct., at 1981. In the present case, this "mobility" of the car, and the resultant exigency of the search, were particularly pressing, since Ochs was not the owner of the car, and his friend, Narday, whom Mitchell, the third member of the thieving party, might have alerted, could have claimed it and its contents at any time. See *United States v. Frick,* 490 F.2d 666, 669–70 (5 Cir. 1973), *cert. denied,* 419 U.S. 831, 95 S.Ct. 55, 42 L.Ed.2d 57 (1974); *United States v. Evans,* 481 F.2d 990, 994 (9 Cir. 1973). Such a search may include containers which police have probable cause to believe may contain evidence of the crime which justifies the search. See, e. g., *United States v. Tramunti,* 513 F.2d 1087, 1104 (2 Cir. 1975), *cert. denied,* 423 U.S. 832, 96 S.Ct. 54, 46 L.Ed.2d 50 (1975); *United States v. Canada,* 527 F.2d 1374, 1379–80 (9 Cir. 1975), *cert. denied,* 429 U.S. 867, 97 S.Ct. 177, 50 L.Ed.2d 147 (1976); *United States v. Davis,* 496 F.2d 1026, 1031–32 (5 Cir. 1974); *United States v. Frick,* 490 F.2d at 669–70 (5 Cir. 1974), *cert. denied,* 419 U.S. 831, 95 S.Ct. 55, 42 L.Ed.2d 57 (1974).

■ We see no indication that the authority of *Chambers* has been impaired. The plurality opinion in *Coolidge v. New Hampshire, supra,* 403 U.S. at 459–60, 91 S.Ct. 2022, was at pains to distinguish *Chambers* as being inapplicable to a car not claimed to have been then engaged in any illegal activity and parked at Coolidge's home, which was seized several weeks after an investigation had commenced, see 403 U.S. at 463–64 & n.20, and 523, 91 S.Ct. 2022 (opinion of Mr. Justice White). In *Cardwell v. Lewis,* 417 U.S. 583, 94 S.Ct. 2464, 41 L.Ed.2d 325 (1974), four Justices thought *Chambers* to be applicable, four thought it not to be, and the casting vote went on a ground that avoided decision of the merits. In any event the case differed from *Chambers* and from ours in that the arrest of the defendant and the seizure of the car were not made under exigent circumstances; there had been ample time to procure a warrant before the car was seized. Finally, although the question may be closer, *United States v. Chadwick, supra,* 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977), did not affect the viability of *Chambers* on facts such as these.[5] The Chief Justice there stressed that the Government did "not contend that the footlocker's brief contact with Chadwick's car makes this an automobile search", 433 U.S. at 11, 97 S.Ct., at 2483–2484, and noted that the Court had sustained " 'warrantless searches of vehicles . . . in cases in which the possibilities of the vehicle's being removed or evidence in it destroyed were remote, if not non-exis-

---

**5.** Some courts have thought the contrary, see *United States v. Stevie,* 582 F.2d 1175, 1179 (8 Cir. 1978) (en banc) *petition* for *cert. filed,* 47 L.W. 3437 (U.S. Dec. 15, 1978) (No. 78–971) (luggage seized in car stopped on the highway can only be searched pursuant to warrant); *United States v. Vallieres,* 443 F.Supp. 186, 191 (D.Conn.1977); see also *Sanders v. State,* 262 Ark. 595, 559 S.W.2d 704 (1977), *cert. granted,* —— U.S. ——, 99 S.Ct. 247, 58 L.Ed.2d 236 (1978) (No. 77–1497). The Ninth Circuit, however, has concluded that luggage searches pursuant to *Chambers* remain untouched by *Chadwick,* see *United States v. Finnegan,* 568 F.2d 637, 641 (9 Cir. 1977). See also *United States v. Gaultney,* 581 F.2d 1137, 1144 (5 Cir. 1978).

And even the Eighth Circuit has shown some reluctance to extend *Chadwick* beyond luggage, see *United States v. Neumann,* 585 F.2d 355, 360–61 (8 Cir. 1978) (closed box can be searched). See also *United States v. Stevie, supra,* 582 F.2d at 1180 (Gibson, J., dissenting); *United States v. Currington,* 451 F.Supp. 39, 43–44 & n.6 (S.D.N.Y.1978); *United States v. McGrath,* 448 F.Supp. 1338, 1341–42 (S.D.N.Y. 1978). Our statement in *United States v. Marchand,* 564 F.2d 983, 991–92 (2 Cir. 1977), *cert. denied,* 434 U.S. 1015, 98 S.Ct. 732, 54 L.Ed.2d 760 (1978), which Chief Judge Gibson criticized in his dissent in *Stevie,* has no bearing on the problem of automobile searches.

tent,'" *id.* at 12, 97 S.Ct., at 2484, quoting *Cady v. Dombrowski,* 413 U.S. 433, 441–42, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973), and citing *Chambers v. Maroney.* The reason for the Government's failure to contend that the *Chadwick* case was governed by *Chambers* was doubtless that the footlocker had never been in the automobile in any meaningful sense; it had been placed in the trunk, which was still open, and the engine had not been started. 433 U.S. at 4, 97 S.Ct. 2476. The Court did not pass on the legality of a warrantless search of suitcases within the car, since the Government had not drawn into question the adverse ruling of the Court of Appeals on this point, 433 U.S. at 5 n.1, 97 S.Ct. 2476, and none of the majority save Mr. Justice Brennan questioned the assertion of Mr. Justice Blackmun (joined by Mr. Justice Rehnquist) in dissent, that "if the agents had postponed the arrest just a few minutes longer until the respondents started to drive away, then the car could have been seized, taken to the agents' office, and all its contents—including the footlocker—searched without a warrant." *Id.* at 22–23 & n.4, 97 S.Ct., at 2489. Two additional circumstances further distinguish this case from *Chadwick.* The first, of lesser consequence, is that the briefcases, unlike the *Chadwick* footlocker, were not locked. The second is the exigent circumstance arising from the likelihood of Narday's appearing at the station and demanding the car and its contents. This implicates directly the statement already quoted from *Chambers* that when probable cause exists, the police must be allowed to make a thorough investigative search of a car and its contents "unless the Fourth Amendment permits a warrantless seizure of the car and the denial of its use to anyone until a warrant is secured", 399 U.S. at 52, 90 S.Ct., at 1981, see *Chadwick, supra,* 433 U.S. at 13–14 n.8, 97 S.Ct. 2476.

■ Since in our view *Chadwick* does not make the search of the contents of the briefcase a *per se* violation of the Fourth Amendment, we prefer to rest our decision on the ground that *Chadwick* did not impair *Chambers* rather than on our decision in *United States v. Reda,* 563 F.2d 510 (2 Cir. 1977), *cert. denied,* 435 U.S. 973, 98 S.Ct. 1617, 56 L.Ed.2d 65 (1978), holding *Chadwick* inapplicable to pre-*Chadwick* searches—in that case also not an automobile search. Appellant claims that *Reda* gave inadequate weight to the remand of *Schleis v. United States,* 433 U.S. 905, 97 S.Ct. 2968, 53 L.Ed.2d 1089 (1977), for further consideration in light of *Chadwick,* see opinion on remand, 582 F.2d 1166, 1173–74 & n.6 (8 Cir. 1978). *Chadwick* was decided after an affirmance of Reda's conviction by oral order from the bench and the effect of *Chadwick* was raised on a *pro se* petition for rehearing. Neither the petition nor the Government's response called the panel's attention to the remand of *Schleis.*[6] While *Reda* remains the law of this circuit, we need not rely on it when what we consider a more satisfactory basis for decision is available.

■ While substitution of *Chambers* for *South Dakota v. Opperman,* 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976), the authority relied on by the district court as the basis for what it held to be a valid inventory search, see 461 F.Supp. at 9, does not end the case, it affords the proper framework for analysis. There is no reason why the conduct of the police in this case should be tested under the more limited principles of *Opperman,* appropriate to the taking of an inventory when there was no reason to believe that the car might contain the fruits or means of a criminal enterprise. There Mr. Justice Powell, whose vote was needed to make up a majority, pointedly observed, 428 U.S. at 380 n.7, 96 S.Ct., at 3102:

As part of their inventory search the police may discover materials such as letters or checkbooks that "touch upon intimate areas of an individual's personal affairs," and "reveal much about a person's activities, associations, and beliefs." *California Bankers Assn. v. Shultz,* 416

---

6. The bearing of the Supreme Court's remand of *Schleis* was likewise not discussed in *United* States v. Montgomery, 558 F.2d 311 (5 Cir. 1977), on which the *Reda* panel relied.

U.S. 21, 78–79, [94 S.Ct. 1494, 1525, 39 L.Ed.2d 812] (1974) (Powell, J., concurring). See also *Fisher v. United States*, 425 U.S. 391, 401 n.7, [96 S.Ct. 1569, 1576, 48 L.Ed.2d 39] (1976). In this case the police found, *inter alia*, "miscellaneous papers," a checkbook, an installment loan book, and a social security status card. . . . There is, however, no evidence in the record that in carrying out their established inventory duties the Vermillion police do other than search for and remove for storage such property without examining its contents.

Mr. Justice Marshall, speaking for four Justices, 428 U.S. at 388 n.6, 96 S.Ct., at 3107, agreed with this and went on to ". . . note that the Court's opinion does not authorize the inspection of suitcases, boxes, or other containers which might themselves be sealed, removed, and secured without further intrusion." To be sure, it is also true that neither the plurality opinion nor Mr. Justice Powell's concurrence says that inspection of containers is *not* authorized in an inventory search, and arguably such containers, at least if unlocked, should be as inspectable as the unlocked glove compartment in *Opperman*, which could also have been sealed. Be all this as it may, the question whether *Opperman* permits inspection of sealable containers as an incident to an inventory is an open and serious one, see, e. g., *United States v. Hill*, 458 F.Supp. 31 (D.D.C.1978), and there is no reason why the Government should have to assume the burden of showing that the search of Ochs' briefcases was permissible as an incident to an inventory search when *Chambers* allowed an investigative search. It is of no importance that the police may have thought their only power was to make an inventory; the test is what could lawfully be done, not what the policemen thought the source of their power to be.

The serious question is whether, granted all this, the search, particularly the reading and seizure of records found in the brief-

case, did not exceed reasonable bounds. It could be argued that since *Chimel v. California, supra*, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 did not overrule *Harris v. United States*, 331 U.S. 145, 67 S.Ct. 1098, 91 L.Ed. 1399 (1947), and *United States v. Rabinovitz*, 339 U.S. 56, 70 S.Ct. 430, 94 L.Ed. 653 (1950), as applied to automobile searches, 395 U.S. at 764 n. 9, 89 S.Ct. 2034, the question is readily answered in favor of the Government. However, we are not obliged to go so far.

We start with the proposition that when in the course of a legal warrantless search a police officer comes upon a suspicious object, he is entitled to inspect it and, if it consists of fruits, instrumentalities or evidence of crime, to seize it, even though the crime was not that which justified the search. *Harris v. United States, supra*, 331 U.S. 154–55, 67 S.Ct. 1098, 91 L.Ed. 1399;[7] *Abel v. United States*, 362 U.S. 217, 234–40, 80 S.Ct. 683, 4 L.Ed.2d 668 (1960); *Coolidge v. New Hampshire*, 403 U.S. 443, 465–66, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971) (plurality opinion); *United States v. Robinson*, 414 U.S. 218, 236, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973); *Gustafson v. Florida*, 414 U.S. 260, 94 S.Ct. 488, 38 L.Ed.2d 456 (1973); *United States v. Duckett*, 583 F.2d 1309, 1312–13 (5th Cir. 1978); *United States v. Bertucci*, 532 F.2d 1144, 1146 (7 Cir.), cert. denied, 429 U.S. 895, 97 S.Ct. 256, 50 L.Ed.2d 178 (1976); *United States v. Bell*, 464 F.2d 667, 674 (2 Cir.), cert. denied, 409 U.S. 991, 93 S.Ct. 335, 34 L.Ed.2d 258 (1972); cf. *United States v. Pugh*, 566 F.2d 626, 627–28 (8 Cir. 1977), cert. denied, 435 U.S. 1010, 98 S.Ct. 1885, 56 L.Ed.2d 393 (1978); *United States v. Rollins*, 522 F.2d 160, 166 (2 Cir. 1975), cert. denied, 424 U.S. 918, 96 S.Ct. 1122, 47 L.Ed.2d 324 (1976); *United States v. Wysocki*, 457 F.2d 1155, 1160–61 (5 Cir.), cert. denied, 409 U.S. 859, 93 S.Ct. 145, 34 L.Ed.2d 105 (1972); *United States v. Patterson*, 447 F.2d 424, 427 (10 Cir. 1971), cert.

---

7. Although *Chimel v. California, supra*, 395 U.S. at 768, 89 S.Ct. 2034, overruled *Harris* with respect to the permitted area of the search, it did not reflect on this holding, and

*Harris* was cited for the proposition in *United States v. Robinson*, 414 U.S. 218, 236, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973).

*denied*, 404 U.S. 1064, 92 S.Ct. 748, 30 L.Ed.2d 752 (1972); *United States v. Simpson*, 453 F.2d 1028 (10 Cir.), *cert. denied*, 408 U.S. 925, 92 S.Ct. 2504, 33 L.Ed.2d 337 (1972); *United States v. Garner*, 451 F.2d 167 (6 Cir. 1971); and *United States v. Gomori*, 437 F.2d 312 (4 Cir. 1971). This principle readily sustains the reading and seizure of the Studio 1 records, loose ledger sheets whose value as evidence of crime was apparent on their face. Even if the Government were here obliged to rely on the "plain view" doctrine, seizure of these sheets met the two express limitations stated by Mr. Justice Stewart in *Coolidge v. New Hampshire, supra*, 403 U.S. at 467–71,

91 S.Ct. 2022, namely, that a lawful search must be in progress and that the discovery of the evidence must be inadvertent, as well as the condition, 403 U.S. at 466–67, 91 S.Ct. at 2038, that "the extension of the original justification is legitimate only where it is immediately apparent to the police that they have evidence before them."[8] We reach the same conclusion with respect to what the parties speak of as "index cards", an appellation conveying a greater sense of formality than is warranted. Compare *United States v. Teller, supra*, 412 F.2d at 379. These cards, which also appear to have been loose, are full of writings describ-

---

**8.** The panel in *United States v. Berenguer*, 562 F.2d 206, 210 (2 Cir. 1977), rephrased this to read "its incriminatory nature must be immediately apparent." We applied this seemingly stricter formulation in *United States v. Diaz*, 577 F.2d 821, 833 (2 Cir. 1978), but found this condition to be satisfied. In so confused an area, it seems best to stick to the exact language of the Supreme Court's plurality opinion rather than to embroider on it even slightly.

The Court has given little guidance as to what it meant by the phrase quoted in text. Justice Stewart, in *Coolidge*, cites his concurring opinion in *Stanley v. Georgia*, 394 U.S. 557, 569–72, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969), where three Justices concurring would have found unlawful a search in which police, after discovering film reels during a search pursuant to warrant for evidence of bookmaking, viewed the films (on a projector on the premises) and seized them as obscene. See also *United States v. Hunt*, 366 F.Supp. 172, 181 (N.D.Tex.1973), *rev'd on different grounds*, 505 F.2d 931 (5 Cir. 1974). Short of this, the question seems to have been raised only in two dissents from denials of *certiorari*. See *Sedillo v. United States*, 419 U.S. 947, 95 S.Ct. 211, 42 L.Ed.2d 168 (1974) (Douglas, J., dissenting); *Gentile v. United States*, 419 U.S. 979, 980 n. 1, 95 S.Ct. 241, 42 L.Ed.2d 191 (1974) (Douglas, J., dissenting).

A number of courts, including this one, have upheld without much discussion the seizure of documents during an otherwise valid search as in "plain view" notwithstanding the fact that some perusal, generally fairly brief, of the documents was clearly necessary in order for the police to perceive the relevance of the document to crime. *Mapp v. Warden*, 531 F.2d 1167, 1172 (2 Cir. 1976), *cert. denied*, 429 U.S. 982, 97 S.Ct. 498, 50 L.Ed.2d 592 (1976) (rent receipts); *United States v. Pugh, supra*, 566 F.2d 626, 637–38 (log of drug distributions seized after view of book entitled "Cocaine Users Handbook"); *United States v. Parker*, 530 F.2d 208, 210–11 (8 Cir. 1976) (ledger

book); *United States v. Gargotto*, 476 F.2d 1009, 1013–15 (6 Cir. 1973), *aff'd after remand*, 510 F.2d 409 (6 Cir. 1974), *cert. denied*, 421 U.S. 987, 95 S.Ct. 1990, 44 L.Ed.2d 477 (1975) (betting records seized during arson investigation); *United States v. Damitz*, 495 F.2d 50 (9 Cir. 1974) (notebook used for recording drug weights); *United States v. Smith*, 462 F.2d 456, 461 (8 Cir. 1972) (lease); *United States v. Henkel*, 451 F.2d 777, 781 & n. 4 (3 Cir. 1971), *cert. denied*, 409 U.S. 859, 93 S.Ct. 144, 34 L.Ed.2d 104 (1972) (serial numbers); *United States v. Maude*, 156 U.S.App.D.C. 378, 384–86, 481 F.2d 1062, 1069–71 (1973) (identification cards); *United States v. Teller*, 412 F.2d 374, 379 (7 Cir. 1969), *cert. denied*, 402 U.S. 949, 91 S.Ct. 1603, 29 L.Ed.2d 118 (1971) (index cards with license numbers); *United States v. Callabrass*, 458 F.Supp. 964 (S.D.N.Y.1978) (papers seized at scene of fire); *United States v. Vallieres*, 443 F.Supp. 186, 191 (D.Conn.1977) (address book in unzipped bag in trunk of car); *United States v. Menke*, 339 F.Supp. 1023, 1026 n. 4 (W.D.Pa.), *rev'd on different grounds*, 468 F.2d 20 (3 Cir. 1972) (address book and mailing registry slip). See also *United States v. Bennett*, 409 U.S. 888, 896–97 (2 Cir. 1969), *cert. denied*, 396 U.S. 852, 90 S.Ct. 113, 24 L.Ed.2d 101 (1969); *United States v. Jenkins*, 496 F.2d 57, 72–74 (2 Cir. 1974), *cert. denied*, 420 U.S. 925, 95 S.Ct. 1119 (1975); *Taylor v. State*, 342 F.Supp. 911, 915 (D.Minn.1972), *aff'd*, 466 F.2d 1119 (8 Cir. 1972), *cert. denied*, 410 U.S. 956, 93 S.Ct. 1425, 35 L.Ed.2d 689 (1973); *contra, In re Calandra*, 332 F.Supp. 737, 745 (N.D.Ohio 1971), *aff'd sub nom. United States v. Calandra*, 465 F.2d 1218 (6 Cir. 1972), *rev'd on different grounds*, 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974). As this court has recently stated, "It would be absurd to require an investigator to be oblivious to that which would be apparent to anyone else with normal powers of observation." *Mapp v. Warden, supra*, 531 F.2d at 1172.

ing loans and payments. Moreover, on one of the two cards submitted to us as samples, the very first entry records a loan to Debbie Frank [McElroy] for $1,500, repayable in 21 weekly payments of $100 each, and the other card seems to show a loan of $555 repayable in 5 weekly instalments of $135.

By this time, the police had probable cause to believe that Ochs was engaged not only in trafficking in stolen travelers' checks and carrying a gravity knife, but also in the conduct of a house of prostitution and a large scale and possibly illegal lending operation. The police were entitled to glance through the bankbooks and the two notebooks to ascertain whether they constituted evidence or instrumentalities relating to the stolen travelers' check ring. *United States v. Frick, supra,* 490 F.2d at 669–70. But even if they were not, the closed records had become highly suspicious in light of the information provided by the open ones. When the police opened the four bankbooks, their suspicions were reasonably heightened by the fact that three of these were in names other than those of Ochs and Narday. See *United States v. Duckett, supra,* 583 F.2d at 1312–13; *United States v. Sedillo,* 496 F.2d 151 (9 Cir. 1974), *cert. denied,* 419 U.S. 947, 95 S.Ct. 211, 42 L.Ed.2d 168 (1974). With so much in the way of cause to believe in Ochs' widespread participation in criminal activities, inspection and seizure of the two notebooks showing loan transactions did not violate the command of the plurality opinion in *Coolidge* that "the 'plain view' doctrine may not be used to extend a general exploratory search from one object to another until something incriminating at last emerges," 403 U.S. at 466, 91 S.Ct. at 2038, even if the Government had to rely on it. On the contrary, the police here advanced from incriminating object to incriminating object. Even under the plain view doctrine in the incriminating nature of an object is generally deemed "immediately apparent" where police have probable cause to believe it is evidence of crime. See, e. g., *United States v. Duckett, supra,* 583 F.2d at 1313–14; *United States v. Johnson,* 541 F.2d 1311, 1316 (8 Cir. 1976); *United States v. Clark,*

531 F.2d 928, 932 (8 Cir. 1976); *United States v. Truitt,* 521 F.2d 1174, 1176–77 (6 Cir. 1975); *United States v. Blake,* 484 F.2d 50, 57 (8 Cir. 1973), *cert. denied,* 417 U.S. 949, 94 S.Ct. 3076, 41 L.Ed.2d 669 (1974); *United States v. Benn,* 441 F.Supp. 1268 (E.D.N.Y.1977). Although one court has suggested that more than probable cause is required, see *United States v. Smollar,* 357 F.Supp. 628, 632 (S.D.N.Y.1972), even that court did not require that officers be "absolutely certain" that they have evidence before them. *Id.* They may test their belief by proceeding with a limited inspection of the "incriminating object." See, e. g., *United States v. Pugh, supra,* 566 F.2d at 627–28; *United States v. Duckett, supra,* 583 F.2d at 1313; *Mapp v. Warden, supra,* 531 F.2d at 1172; *United States v. Patterson, supra,* 447 F.2d at 427; *United States v. Damitz, supra,* 495 F.2d at 56; *United States v. Blake, supra,* 484 F.2d at 57; *United States v. Smollar, supra,* 357 F.Supp. at 63. Surely the police in this case had probable cause to believe that the remaining records might constitute further evidence of any one of the several crimes that had been progressively unfolding before their eyes. Prostitution and loansharking are crimes that demand record keeping, and the proximity of these closed records to the clearly incriminating loose records in the very same briefcase gave the police probable cause to believe that the closed records might contain evidence relating to the crimes already discovered. The standard for probable cause in the seizure of documents appears to be the same as it is with respect to any other seizure of "mere evidence"—i. e., probable cause must be examined in terms of cause to believe that the evidence sought will aid in a particular apprehension or conviction. In this examination, consideration of police purposes is required. *Warden v. Hayden,* 387 U.S. 294, 307, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967); *Andresen v. Maryland,* 427 U.S. 463, 483, 96 S.Ct. 2737, 49 L.Ed.2d 627 (1976). Here, it seems clear that the police had probable cause to seize the records as potentially constituting evidence or instrumentalities

relating to any one of three "particular" crimes.

■ Under all these circumstances, it would outrage common sense and human nature to read the Fourth Amendment to require that after having lawfully opened the briefcase and inspected the Studio 1 ledger sheets, the cards and at least the front sheets of the bankbooks, the police should be required to interrupt their work and apply for a warrant before going further, particularly when there was no telling when Narday might show up and demand the return of the car and its contents. See *Lowe v. Caldwell*, 367 F.Supp. 46, 53 n. 11 (S.D.Ga.1973), *vacated and remanded sub nom. Lowe v. Hopper*, 501 F.2d 952 (5 Cir. 1974), *adhered to*, 400 F.Supp. 970 (S.D.Ga.), *aff'd*, 520 F.2d 1045 (5 Cir. 1975).

What gives a certain amount of pause about this case is that the material seized by the police in their *Chambers*-justified investigative inspection of the briefcase was not hardware or contraband but records. Under the old rule of *United States v. Lefkowitz*, 285 U.S. 452, 465–66, 52 S.Ct. 420, 76 L.Ed. 877 (1932), the search of the briefcase could not lawfully have encompassed "mere evidence." When that rule was abrogated in *Warden v. Hayden*, 387 U.S. 294, 303, 87 S.Ct. 1642, 1648, 18 L.Ed.2d 782 (1967), the Court noted that the items there at issue were not "testimonial" or "communicative" in nature and that it was thus not required to "consider whether there are items of evidential value whose very nature precludes them from being the object of a reasonable search and seizure." We gave some attention to this problem in *United States v. Bennett, supra*, 409 F.2d at 895–97, without being required to resolve it. The Supreme Court has recently held in *Andresen v. Maryland*, 427 U.S. 463, 96 S.Ct. 2737, 49 L.Ed.2d 627 (1976), that a proper search and seizure, pursuant to a warrant, of a defendant's incriminating business records which had been voluntarily reduced to writing offended no Fifth Amendment interests of the defendant. *Id.* at 474–77, 96 S.Ct. 2737. The Court found that, provided the search and seizure met the requirements of the fourth amendment's warrant clause, privacy interests are adequately protected. See Note, *Formalism, Legal Realism, and Constitutionally Protected Privacy under the Fourth and Fifth Amendments*, 90 Harv.L.Rev. 945, 979 (1977). The Court in *Andresen* did not address the question of warrantless searches for documents which fall within recognized exceptions to the warrant requirement.[9] Since Ochs has not raised the question, we see no reason to do so here.[10]

## II. *Claims of Trial Error*

Ochs mounts a series of attacks on the conduct of the trial. These deserve only brief treatment.

---

9. The documents listed in the warrant in *Andresen* were evidence of a real estate fraud and were limited to dealings relating to a single lot (13T). Some documents were seized which related to a different lot, and these documents were used "to secure additional charges" against the defendant. *Id.* 427 U.S. at 484, 96 S.Ct. 2737. However, the Court found that the documents were within the warrant, since they would have been admissible with respect to lot 13T as "proof of similar acts is admissible to show intent." *Id.* at 483, 96 S.Ct. at 2750.

10. In view of our conclusion we find no need to consider an alternative theory propounded by the Government on the basis of *United States v. Zaicek*, 519 F.2d 412 (2 Cir. 1975). Relying on a supposed analogy to cases arising under federal and state statutes forfeiting vehicles which carry contraband, see *United States v. Francolino*, 367 F.2d 1013 (2 Cir. 1966), *cert. denied*, 386 U.S. 960, 87 S.Ct. 1020, 18 L.Ed.2d 110 (1967), and *Cooper v. California*, 386 U.S. 58, 87 S.Ct. 788, 17 L.Ed.2d 730 (1967), the majority in that case held that when a car had been seized at the request of the owner under § 424(3) of New York's Vehicle & Traffic Law, which grants a police officer "power to seize any motor vehicle . . . when there is good reason to believe that such motor vehicle . . . has been stolen . . . .", the vehicle and its contents were subject to search since the police had a possessory interest superior to the thief's. Here Ochs had not stolen the car, and we are far from satisfied that the police had probable cause to think he had. Indeed, it is questionable that they really did; when they arrived at the precinct station, no further effort was made to ascertain from the National Crime Information Computer whether the Cadillac was on the list of stolen cars.

Other theories advanced by the Government, even if sound, would lead it no further than does the application of *Chambers v. Maroney*.

The first objection relates to the admission of "prejudicial" evidence of Ochs' engagement in loansharking and prostitution. This evidence was directly relevant to Count Seven which charged Ochs with evading federal income taxes on "income derived from extortion, loansharking and prostitution," *United States v. McGrath*, 558 F.2d 1102 (2 Cir. 1977), *cert. denied*, 434 U.S. 1064, 98 S.Ct. 1239, 55 L.Ed.2d 765 (1978); *United States v. Eliano*, 522 F.2d 201 (2 Cir. 1975), and also afforded necessary background to the obstruction of justice count. See *United States v. Weiss*, 491 F.2d 460, 466–67 (2 Cir.), *cert. denied*, 419 U.S. 833, 95 S.Ct. 58, 42 L.Ed.2d 59 (1974). Objection to admission of a tape recording of Ochs' attempt to bribe Officer O'Malley to perjure himself about where and how the knife was found in the Cadillac is likewise without merit. The attempted bribery was admissible as showing consciousness of guilt, see *United States v. Cirillo*, 468 F.2d 1233, 1240 (2 Cir. 1972), *cert. denied*, 410 U.S. 989, 93 S.Ct. 1501, 36 L.Ed.2d 188 (1973), and as an act of concealment relevant to the charge of wilful evasion of income taxes in Count Seven. *Barcott v. United States*, 169 F.2d 929, 932 (9 Cir. 1948). There is equally little merit in the claims of error in allowing the Government to bring out that Debbie Frank McElroy, one of the victims of Ochs' extortion, had been a prostitute. It was her decision to quit the oldest profession that led to her falling into default, the consequent threats, and her return to Studio One to earn money to repay Ochs. Again we see no possible merit in the claim that it was error to allow numerous debtors to testify that Ochs instructed them to mail remittances to "Gambino" at a Bronx address. If Ochs chose to make false use of the name of a well-known underworld figure to instill fear, he must bear the consequences. *United States v. Cirillo, supra*, 468 F.2d at 1240; *United States v. Zito*, 467 F.2d 1401, 1405 (2 Cir. 1972).

Ochs next complains of the trial court's denial of his motion to sever the tax counts under F.R.Cr.P. 14.[11] To obtain reversal, Ochs must show that the refusal to sever was so unfairly prejudicial as to constitute an abuse of discretion. As we have recently noted, " '[W]e are reluctant to overturn a conviction for denial of a motion for severance unless there is a showing of substantial prejudice. . . . It is not sufficient merely to show that the accused would have had a better chance for acquittal at a separate trial.' " *United States v. Lyles*, 593 F.2d 182, 189 (2 Cir. Jan. 31, 1979) (quoting *United States v. Stirling*, 571 F.2d 708, 733 (2 Cir.), *cert. denied*, —— U.S. ——, 99 S.Ct. 93, 58 L.Ed.2d 116 (1978)); see also *United States v. Corr*, 543 F.2d 1042, 1052 (2 Cir. 1976); *United States v. Papadakis*, 510 F.2d 287, 300–01 (2 Cir.), *cert. denied*, 421 U.S. 950, 95 S.Ct. 1682, 44 L.Ed.2d 104 (1975).

We find no "substantial prejudice" here. Most, if not all, of the evidence on the extortion and obstruction of justice

---

11. Ochs did not raise the question of misjoinder under F.R.Cr.P. 8. It now appears, in light of our recent decision in *United States v. Halper*, 590 F.2d 422 (2 Cir. 1978), subsequent to the argument in this case, that if the trial court had been presented with a proper claim of misjoinder pursuant to F.R.Cr.P. 8(a), it might have been required to grant a severance as a matter of law. In *Halper*, it was held that, on the facts of that case, joinder of counts of tax evasion and Medicaid fraud would be improper under F.R.Cr.P. 8(a) and that the error was prejudicial. We need not determine whether *Halper* would be applicable here. Since Ochs failed to challenge the indictment below for misjoinder under F.R.Cr.P. 8(a), he has waived that objection. F.R.Cr.P. 12(b)(2); 8 Moore, Federal Practice ¶ 12.03[2] (1978 ver.). Furthermore, it is well-settled in this circuit that the "harmless error" doctrine, F.R.Cr.P. 52(a), applies in cases of misjoinder. See, *e. g., United States v. Turbide*, 558 F.2d 1053, 1061 (2 Cir.), *cert. denied*, 434 U.S. 934, 98 S.Ct. 421, 54 L.Ed.2d 293 (1977); *United States v. Granello*, 365 F.2d 990, 995 (2 Cir. 1966), *cert. denied*, 386 U.S. 1019, 87 S.Ct. 1367, 18 L.Ed.2d 458 (1967). Misjoinder is typically found harmless where evidence tending to prove the charge that should have been severed would nevertheless have been admissible at the severed trial. *United States v. Turbide, supra*, 558 F.2d at 1061; *United States v. Granello, supra*, 365 F.2d at 995. Since we find that to be the case here, see text *infra*, any misjoinder error here would have been harmless even if Ochs had preserved his objection.

counts would have been admissible on the evasion of taxes count, and the joinder of the latter was not prejudicial as to the former. See *United States v. McGrath, supra*, 558 F.2d at 1106. The false exemption counts were sufficiently discrete that we see no danger of prejudicial spill-over. Ochs' claim that he would have testified on the false exemption counts if they had been severed is advanced for the first time in this court and thus need not be considered.[12]

■ The argument of insufficiency of the evidence on the extortion count, also raised for the first time on appeal, borders on the frivolous. It is unnecessary to go beyond the evidence, first communicated in slightly different terms through a friend and then directly, that if McElroy did not pay up, "she is going to have a broken head and be found floating in the river." [13]

Equally meritless is Ochs' claim relating to a stipulation entered into between Ochs and the Government in connection with the false exemption claims. This stipulation stated that an official of a "New York agency" would testify that during an eighteen-month period when Ochs was required to make a statement regarding his marital status, dependents and place of residence, he gave no indication that he was married or had children. Ochs argues that this might have led a juror to speculate that the "agency" was a prison or parole authority, as in fact it was. In framing the stipulation, the Government and the court went far beyond anything required of them, as did the court in instructing the jury, to bring the danger of prejudice to Ochs as near to zero as was possible.

### III. *Claims of Error in the Charge*

■ Although no exception was taken at the trial, Ochs now objects to a portion of the charge on the obstruction of justice count:

The indictment specifically charges the defendant with 'corruptly' endeavoring to influence the designated witness or witnesses. The word 'corruptly' does not add an additional element to the crime. I charge you as a matter of law that any unauthorized endeavor to influence a witness in the performance of his duty to testify violates the law. It is the endeavor, not the corruption, which is the gist of the crime.

Since the statute defines the offense, 18 U.S.C. § 1503, as:

Whoever corruptly, or by threats or force, or by any threatening letter or communication, endeavors to influence, intimidate, or impede any witness, in any court of the United States . . . shall be fined . . . or imprisoned . . ."

we do not understand why the judge said what he did. If, as the Government suggests, he was trying to explain that the crime lay in the endeavor even if it did not succeed, the language was not apt to that end. However, he had previously said:

The defendant must corruptly endeavor, that is deliberately and by his action, to influence the witness to testify falsely, evasively, or to corruptly have the witness assert their [sic] Fifth Amendment privilege when otherwise they would testify.

and added immediately after the challenged instruction that:

[a]ny . . . endeavor, whether successful or not, which is made for the purpose of corruptly influencing a witness is condemned.

We therefore do not regard the charge as plain error requiring reversal in the absence of objection.

■ The only other objection to the charge deserving comment relates to the

---

**12.** Beyond this, as the Government points out, it is hardly likely that Ochs, with five felony convictions which could have been used for impeachment, would have taken the stand even on a trial limited to the false exemption counts and, if he had any defense, the alleged wives and children were available as witnesses.

**13.** This aquatic threat seems to be quite venerable, see *United States v. Kennedy*, 291 F.2d 457, 459 (2 Cir. 1961).

tax evasion count. The judge instructed that in the absence of contrary agreement between debtor and creditor, payments are first to be applied to interest. Ochs contends that this deprived him of his defense that he believed he was entitled to treat repayments on legally unenforceable usurious loans as a return of principal until payments exceeding that sum were received. At best the point would cover only a small portion of the unreported income. In view of this and of other factors urged in the Government's brief, we find no prejudicial error.

### IV. *Attack on the Sentence*

■ Ochs contends that the imposition of consecutive terms of three years, the maximum permissible, on the three false exemption counts, was so irrational and consequently such a manifest abuse of discretion as to be within this court's power to correct. See *United States v. McCord*, 466 F.2d 17 (2 Cir. 1972), and cases there cited. He claims that the false exemptions amounted to only $2,500 per count; that the general practice in the Southern District of New York is to impose only suspended sentences and fines for such offenses; and that it was irrational to impose what amounted to a nine-year sentence for these minor offenses as compared with a two-year sentence for the more serious crime of tax evasion, I.R.C. § 7201. Ochs also suggests that the heavy sentence on the false exemption counts may have been due to the court's having "structured its sentence to immunize the maximum amount of custodial time from any reversal as to the suppression issue . . ." and invokes *United States v. Ramos*, 572 F.2d 360 (2 Cir. 1978).

We are not disposed to use this case to test the limits of our power with respect to sentences that are within legal limits and are not shown to have been based upon materially inaccurate information. Judge Cooper was dealing not with a man who had simply yielded to the temptation to cheat the Government of income taxes by claiming false exemptions but with an individual whose whole life from the age of 16 to his then age of 48 had shown a contemptuous disregard for law. After serving jail sentences and being released on parole, he repeatedly violated parole by committing new crimes. On the undisputed record disclosed in the pre-sentence report, the judge could reasonably have given Ochs an even higher total sentence than he did. Particularly in light of our disposition of the suppression claim, we are not concerned with how the sentence was structured.

We have considered many other claims of error but do not deem them worthy of discussion.

Affirmed.

MESKILL, Circuit Judge (concurring):

I concur in the result announced today and in parts II, III and IV of Judge Friendly's opinion.

Justice Rehnquist observed in *Cady v. Dombrowski*, 413 U.S. 433, 440, 93 S.Ct. 2523, 2527, 37 L.Ed.2d 706 (1973), that the law governing warrantless searches and seizures, especially those involving vehicles, "is something less than a seamless web." So serious is the confusion that six years after *Cady* it can fairly be said that the law in this area is developing without any predictability or even discernible direction. Warrantless vehicle search cases shed virtually no light on fact situations which, if one were to attempt to apply the usual methods of legal reasoning, would seem to be distinguishable only on the basis of trivialities. Thus the precedents cast shadows rather than light, making the resolution of each succeeding case less rather than more certain.

In the two years since the Supreme Court held unreasonable the warrantless search of a footlocker removed by federal agents from the trunk of an automobile, *United States v. Chadwick*, 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977), the lower federal courts have been unable to harmonize their approaches to searches of flight bags, suitcases, and other containers removed from automobiles. *See, e. g.,* the following cases, all of which either involved a post-

*Chadwick* search or assumed or held *Chadwick* to apply retroactively: *United States v. Neumann*, 585 F.2d 355 (8th Cir. 1978) (post-*Chadwick* warrantless search, on the scene, of closed but unsecured Dayton's Department Store box removed from vehicle after arrest of occupants, held reasonable as either investigative or inventory search, distinguishing *Chadwick*); *United States v. Stevie*, 582 F.2d 1175 (8th Cir. 1978) (*en banc*, reversing panel decision reported at 578 F.2d 204 (1977)), *petition for cert. filed*, 582 F.2d 1175 (1978) (pre-*Chadwick* warrantless investigative search, on the scene, of suitcase removed from back of station wagon held unreasonable, citing *Chadwick*); *United States v. Finnegan*, 568 F.2d 637 (9th Cir. 1977) (pre-*Chadwick* warrantless investigative search, on the scene, of closed suitcase removed from hatchback of vehicle held reasonable, citing *Chambers v. Maroney*, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970), and distinguishing *Chadwick*); *United States v. Hill*, 458 F.Supp. 31 (D.D. C.1978) (post-*Chadwick* warrantless inventory search, at police station, of open flight bag removed from locked trunk of impounded vehicle held unreasonable, citing *Chadwick*). *See also Sanders v. State*, 262 Ark. 595, 559 S.W.2d 704 (1977), *cert. granted*, ── U.S. ──, 99 S.Ct. 247, 58 L.Ed.2d 236 (1978) (pre-*Chadwick* warrantless search, on the scene, of suitcase removed from trunk of taxicab held unreasonable, citing *Chadwick*). Clearly, when the precedents in such a crucial area of constitutional law offer so little guidance that it is difficult to choose between opposite results on the basis of superior reasoning, our ability to dispense justice is severely hampered. Nevertheless, we are obligated to decide the appeals that come before us.

I concur in today's result but I take a different path from that followed by Judge Friendly. Given the state of the law, Judge Friendly's analysis cannot be rejected as implausible, although I think it may underestimate the intended impact of *Chadwick* on *Chambers*. I prefer to leave exploration of the effect of *Chadwick* on vehicle searches, whether "inventory" or "investigative" for a case to which *Chadwick* is clearly applicable.

Shortly after *Chadwick* was handed down, this Court held that the decision was not to be given retroactive effect. *United States v. Reda*, 563 F.2d 510 (2d Cir. 1977), *cert. denied*, 435 U.S. 973, 98 S.Ct. 1617, 56 L.Ed.2d 65 (1978). *See also United States v. Diaz*, 577 F.2d 821, 824 (2d Cir. 1978). The *Reda* panel relied on *United States v. Peltier*, 422 U.S. 531, 95 S.Ct. 2313, 45 L.Ed.2d 374 (1975), in which the Supreme Court addressed the question of the retroactive application of exclusionary rule decisions. The *Peltier* Court reasoned that neither the judicial integrity rationale nor the deterrence of police misconduct rationale would justify retroactive exclusion of evidence seized by law enforcement officers who reasonably believed in good faith that their search was in accordance with the law, even though decisions subsequent to the search have broadened the exclusionary rule to encompass evidence seized in that manner. To date, three courts of appeals besides our own have read *Peltier* to bar the retroactive application of *Chadwick*. *United States v. Choate*, 576 F.2d 165, 182 n.20 (9th Cir.), *cert. denied*, ── U.S. ── 99 S.Ct. 350, 58 L.Ed.2d 344 (1978); *United States v. Berry*, 571 F.2d 2 (7th Cir. 1978); *United States v. Montgomery*, 558 F.2d 311 (5th Cir. 1977). *But see United States v. Schleis*, 582 F.2d 1166 (8th Cir. 1978) (*en banc*).[1] Since the Supreme Court has not

---

1. In June of 1977 the Supreme Court vacated a judgment of the Court of Appeals for the Eighth Circuit, involving a 1974 briefcase search, 543 F.2d 59 (1976), and remanded for further consideration in light of *Chadwick*. *Schleis v. United States*, 433 U.S. 905, 97 S.Ct. 2968, 53 L.Ed.2d 1089 (1977). I do not read the *Schleis* remand as an indication that *Chadwick* is necessarily to be given retroactive effect. Four courts of appeals have held *Chadwick* not

retroactive. *United States v. Montgomery*, 558 F.2d 311 (5th Cir. 1977); *United States v. Reda*, 563 F.2d 510 (2d Cir. 1977), *cert. denied*, 435 U.S. 973, 98 S.Ct. 1617, 56 L.Ed.2d 65 (1978); *United States v. Berry*, 571 F.2d 2 (7th Cir. 1978); *United States v. Choate*, 576 F.2d 165, 182 n.20 (9th Cir. 1978). *See also United States v. Powell*, 449 F.Supp. 562 (E.D.Pa. 1978). Each of these cases was decided after the Supreme Court remanded the *Schleis* case

as yet passed on the retroactivity of *Chadwick, Reda* is the law of this Circuit. Thus there is no need today to assess the impact of *Chadwick* on warrantless vehicle searches, either "investigative" or "inventory."

Putting *Chadwick* aside and viewing the law as it stood at the time of the search, I see no reason why the itemizing of the contents of Ochs' briefcase should not be regarded as having been performed pursuant to a legitimate inventory search. Three years ago, in *South Dakota v. Opperman*, 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976), the Supreme Court upheld as reasonable the inventory search of a vehicle properly taken into police custody, and the incriminating evidence found in the glove compartment was held admissible at trial. In the instant case, the trial court found that, as in *Opperman*, the "vouchering" or invoicing of property coming into police custody was standard departmental procedure at the time the search was made. There was simply no reason for the officers to suspect that the warrantless opening of Ochs' briefcase stood on a different constitutional footing than the warrantless opening of the glove compartment or the trunk. In the years preceding *Chadwick* several courts of appeals writing both before and after *Opperman* failed to appreciate the distinction, between containers built into vehicles (*e. g.*, trunks and glove compartments) and removable containers found within vehicles (e. g., footlockers), that was subsequently drawn by *Chadwick*. *See, e. g., United States v. McCambridge*, 551 F.2d 865 (1st Cir. 1977) (warrantless search at police station, of stolen suitcase taken from automobile, held reasonable under both *Opperman* and *Chambers*). *See also United States v. Friesen*, 545 F.2d 672, 673–74 (9th Cir. 1976) *cert. denied*, 433 U.S. 911, 97 S.Ct.

2980, 53 L.Ed.2d 1096 (1977) ("Where property is validly held by law enforcement officers for which they may have responsibility, it seems a useless gesture, whether it be an automobile or a suitcase, to require a search warrant to effect an inventory of the property."); *United States v. Diggs*, 544 F.2d 116, 125 (3d Cir. 1976) (Gibbons J., concurring) ("Since the agents were lawfully in possession of the box, it seems to me that they were authorized to make an inventory search. . . . No principled distinction . . . can be made for *inventory* search purposes between lawful possession of a car and lawful possession of a box.") (emphasis added; citation omitted) (reversed in *United States v. Diggs*, 569 F.2d 1264 (3d Cir. 1977) (Gibbons, J.), holding search unreasonable, on appeal after remand, because found to have been conducted for investigative rather than for inventory purposes); *United States v. Giles*, 536 F.2d 136, 140 (6th Cir. 1976) (warrantless inventory search of luggage removed from automobile trunk after arrest of driver upheld); *United States v. Zaicek*, 519 F.2d 412 (2d Cir. 1975) (warrantless search at headquarters of attache case removed from stolen vehicle seized by police upheld); *United States v. Soriano*, 497 F.2d 147, 149 (5th Cir. 1974) (*en banc*) (upholding warrantless investigative search, on the highway, of suitcase taken from vehicle; "though it is true that the [*Chambers*] Court spoke of an automobile while we treat of containers in or just removed from one, the principle is not different"); *United States v. Gravitt*, 484 F.2d 375, 378 (5th Cir. 1973), *cert. denied*, 414 U.S. 1135, 94 S.Ct. 879, 38 L.Ed.2d 761 (1974) ("when the police take custody of any sort of container—be it an automobile, suitcase, or any other thing in which property may be stored—it is reasonable to search the container to itemize

to the Eighth Circuit for consideration in light of *Chadwick* (which had been decided six days before the remand was ordered). *But see United States v. Schleis*, 582 F.2d 1166, 1173–74 & n.6 (8th Cir. 1978) (viewing remand as direction to apply *Chadwick* retroactively). *Compare Winkle v. Bannan*, 368 U.S. 34, 82 S.Ct. 146, 7 L.Ed.2d 91 (1961), remanding case for consideration in light of *Mapp v. Ohio*, 367 U.S. 643, 81

S.Ct. 1684, 6 L.Ed.2d 1081 (1961). Four years after *Winkle*, in *Linkletter v. Walker*, 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965), the Supreme Court, acting with the benefit of the previously expressed and conflicting views of six courts of appeals, held *Mapp* not to apply to state court convictions which, like the conviction in *Winkle*, had become final before *Mapp* was decided.

the property to be held by the police") (cited in *Opperman, supra,* 428 U.S. at 371, 96 S.Ct. at 3098).

*Chadwick,* by distinguishing for Fourth Amendment purposes the intrusiveness of a search from that of a seizure, and by distinguishing among types of containers, introduces new considerations that may in future cases affect our view of the proper scope of both warrantless inventory searches of vehicles in police custody and warrantless investigative searches of vehicles. However, to my mind, the search of Ochs' briefcase was reasonable under the then-prevailing interpretation of the Fourth Amendment. I agree with Judge Friendly that having lawfully opened the briefcase, the officers were justified in seizing the clearly incriminating evidence that was in plain view. Under *Peltier* and *Reda* it would be inappropriate to exclude the evidence turned up in the course of this search.